## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| SAGE ENTERPRISES, INC., | ) ) | Case No. 04 B 05548 |
| Debtor. | ) ) | |
| | ) | |
| HORACE D. FOX, Chapter 7 Trustee of the Estate of Sage Enterprises, Inc., | ) ) ) | Hon. Susan Pierson Sonderby |
| Plaintiff, | ) ) | Adv. No. 04 A 04429 |
| v. | ) ) | |
| CONTINENTAL AIRLINES, INC. | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

This matter comes before the court on Defendant Continental Airlines, Inc.'s Motion for Summary Judgment, seeking judgment in its favor on Counts I and II of the amended adversary complaint herein (the "Complaint"), as well as judgment on its counterclaim. For the reasons set forth below, the motion will be granted as to Count II and denied as to Count I and as to the counterclaim.[1]

---

[1]    The court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334 and 157. Both parties allege that this proceeding is a core proceeding. To the extent that this proceeding is in fact a non-core proceeding, the Trustee has expressly consented to a final determination by this court.

Unless otherwise indicated, there is no genuine dispute as to the following facts.  On February 13, 2004, an involuntary petition under chapter 7 of the Bankruptcy Code was filed against Debtor, Sage Enterprises, Inc. ("Sage" or "Debtor").  An order for relief under Chapter 7 was entered on March 3, 2004.

In December, 2000, Continental Airlines, Inc. ("Continental") and Sage executed an agreement entitled "Contract No. 991011301 Between Sage Enterprises, Inc. and Continental Airlines, Inc. for Equipment Distribution" (the "Contract").  The Contract was to be in effect from January 1, 2001 through December 31, 2004.  Paragraph 1 of the Contract provided in part as follows:

> [Sage] shall act as [Continental's] agent by providing planning inventory, purchasing, warehousing, and distributing services (together, the "Services") with respect to certain supplies listed in Exhibit A (hereinafter "Equipment") for the stations listed in Exhibit B.

Exhibit A to the Contract, captioned "Continental Equipment Master List," is a list of suppliers, items, and prices for the "equipment" (goods) to be purchased under the Contract, e.g., cups, silverware, trays, beverage carts, ice buckets, coffee pots, headrests, pillows, soap, and other items needed for Continental's flights (collectively, the "Equipment").  Continental selected its own suppliers (the "Suppliers") and Equipment, and the Suppliers understood that Sage would be acting on behalf of Continental in purchasing Equipment under the Contract.

Sage did not wait, however, for purchase orders from Continental before Sage purchased Equipment from the Suppliers.  Indeed, Sage would anticipate Continental's needs and warehouse sufficient Equipment to meet those needs.  To achieve this, Sage would place purchase orders with the Suppliers, purchase the Equipment, and move the Equipment into its warehouse, where it would be available for Continental to purchase from Sage. The Suppliers issued invoices for the Equipment

–2–

directly to Sage, and Continental never received copies of the Suppliers' invoices.

Pursuant to the Contract, Continental would place orders with Sage for Equipment, as needed. The Contract provided that Sage would issue to Continental invoices "for Equipment and Service Fees" on a weekly basis, for the various bundles of Equipment that Sage was delivering to Continental's different locations. The Contract further provided that payment for invoices issued by Sage to Continental was due 30 days from receipt of either the goods or an invoice, whichever was later.

Sage did not wait for Continental's money to come in to pay the Suppliers. Indeed, a portion of Continental's payment was related to Sage's costs for financing the inventory. Sage was referred to as "Seller" in the Contract, and Continental was referred to as "Buyer," and title to and risk of loss for the Equipment did not pass from Sage to Continental until Continental actually received the Equipment. Pursuant to the Contract, Continental paid Sage not only the actual cost of Equipment (and certain fuel adjustment charges), but also a service fee, which was calculated at a cost of $0.182 per pound of Equipment (the "Service Fee"). The Contract states that Sage's Service Fee is related to Sage's costs for financing the inventory and for human resources, vehicles, building overhead costs, and taxes.

In ¶ 19A of the Contract, Sage warranted and represented to Continental that

> ... it will pay all suppliers on or before the date that such payment is due. If suppliers require the assistance of Buyer [i.e., Continental] for payment from Seller [i.e., Sage], Seller shall pay Buyer liquidated damages of $75.00 per occurrence plus 1% of the overdue balance due to the applicable supplier to Seller, unless Seller has made, in Buyer's opinion, all reasonable attempts to resolve any disputed invoices.

Prior to the inclusion of this provision in the Contract, Continental and Sage did not have such a liquidated damages provision in their previous agreements.

After operating under the Contract for a number of years, Sage announced, on November 21, 2003, that it was going to have to discontinue business and wind up its affairs in an orderly fashion. Sage sent a letter on that date to Continental, stating, *inter alia*, that as a result of changes in the industry--including changes brought about by the terrorist attacks of September 11, 2001--it had suffered staggering losses month after month in 2003. The letter further stated that all supplier accounts payable then due were frozen. Sage advised:

> Going forward, we will of course abide by any new payment terms imposed by the suppliers for new purchases. We plan to work with you in every reasonable way possible to ensure a smooth/seamless transition. ... A key objective in this orderly liquidation process is to minimize any disruption in your service.

Sage sent a similar letter to the Suppliers, which also stated:

> As of 11:59 PM Thursday, 11/20/03, any payments not made for product already received have been frozen. Unless we hear from you otherwise, we will make payments in normal terms for goods received after 11/20/03 and for new goods we may need in order to help facilitate the orderly wind down of our business and continue to support our mutual airline customers during the upcoming transition.

> As a result of our ongoing losses it appears that most of the liquidation proceeds will go to our secured creditors. We will distribute any excess proceeds to our unsecured creditors on a pro-rata basis.

Sage reiterated, in a December 12, 2003 letter to Suppliers, that once its secured creditor was satisfied, any remaining balance would be distributed pro rata to the unsecured creditors, and it asked Suppliers to provide a detailed listing of their claims.

After the November 21, 2003 announcement, certain of the Suppliers made reclamation demands on Sage, which the Trustee states were declined pursuant to applicable law. During this period, Sage continued to sell and deliver Equipment to Continental, and Continental accepted--but did not pay for--such Equipment. While Continental continued to work down Sage's inventory, it

-4-

also issued direct purchase orders to the Suppliers and distributed product to itself. By December 8, 2003, Continental had already negotiated direct arrangements not only with the Suppliers but also with a substitute distribution company, the Michael Lewis Company.

On December 15, 2003, Continental transmitted a letter to Sage (the "Termination Notice"), stating that it was exercising its right to immediately terminate the Contract for cause. The letter references Sage's November 21, 2003 announcement of its orderly liquidation and freeze of payments to Suppliers for Equipment previously delivered. The Termination Notice then sets forth Sage's warranty of timely payment to Suppliers contained in ¶ 19A of the Contract, as well as the liquidated damages provision, as quoted above. The Termination Notice continues:

> Since the [November 21, 2003 memorandum] was issued, Continental has been contacted by several suppliers from which Sage was purchasing products to distribute to Continental under the Agreement, to notify Continental that Sage has failed to pay invoices timely and that such suppliers now require Continental to pay those invoices.

Continental further states in the Termination Notice that it has incurred and continues to incur damages, that it is exercising a right of set off and terminating the agreement, and that it "nevertheless hopes and intends to work with Sage in good faith to determine how best to wind-down this relationship in a manner that serves all parties' interests."

Continental thereafter paid the Suppliers directly for certain Equipment delivered to Continental by Sage. In his complaint, the Trustee identifies forty-three Suppliers that Continental paid directly. The Trustee admits that Sage never paid the Suppliers for the Equipment that was the subject of Continental's direct payments. He contends, however, that Continental was not entitled under the Contract to bypass the Debtor and pay the Suppliers directly. In Count I of his Complaint, the Trustee seeks to recover from Continental breach of contract damages aggregating "at least $2,510,385.25." In his memorandum in opposition to Continental's summary judgment motion (the

"Opposition Memo"), however, he states that the amount at issue--i.e., "the amount eventually paid by Continental to Suppliers for Equipment"--was later fixed through a reconciliation process at $2,288,678.31. (Opposition Memo, at 3).

Count II of the Trustee's complaint sounds in "account stated." He alleges, *inter alia*, that Continental "never seasonably objected to the amounts requested by, or the account stated of, Debtor," and he attaches a copy of the account to the Complaint as Exhibit A.

Continental answered the Complaint and filed a counterclaim seeking damages under the "liquidated damages" provision of ¶ 19A of the Contract, quoted above. In its counterclaim, Continental alleges that it was notified by several Suppliers that Debtor had failed to timely pay invoices and that Continental's assistance was required to pay them. Continental states that it "assisted" in the payment of such invoices within the meaning of ¶ 19A, and it therefore seeks $26,113.78 in liquidated damages. The damages are calculated under ¶ 19A as $3,225 (representing 43 "occurrences" multiplied by $75 per occurrence) plus $22,888.78 (1% of the overdue balance of $2,288,878.31).

In its motion, Continental contends that it is entitled to summary judgment on Count I of the Complaint because Sage materially breached the Contract, and Sage's material breach discharged Continental from its obligations to further perform. Continental notes that under Texas law, which is applicable pursuant to ¶ 20 of the Contract, a material breach by one contracting party excuses the performance of the other. Continental reviews the five factors considered by Texas courts in determining the materiality of a breach, including the extent to which the injured party will be deprived of the benefit he reasonably expected. According to Continental, its key benefit under the Contract was "the efficient delivery of goods from its suppliers to its stations." (Memorandum in Support of Summary Judgment ("Supporting Memo"), at 7). Continental contends that because

several of the Suppliers wanted their goods back and several turned to Continental for payment, Sage's breach deprived Continental of this key benefit. Continental further contends that "[g]iven the prospect of a break in supply," it "*had* to pay its suppliers directly" in order to keep the supply lines open. *Id.* (Emphasis added.)

The Trustee first contends that the Uniform Commercial Code ("UCC") is applicable to Sage's sale of goods to Continental and that under the UCC, a party to a sale of goods "is not automatically excused from its contractual performance, particularly for outstanding payables owed, by the prior breach of the other party." (Opposition Memo, at 3). Under the UCC, "a buyer that has accepted goods is limited in its remedies to damages for 'nonconformity of tender' ..." (Opposition Memo, at 5-6).

Even if, however, the UCC did not preempt Continental's common law defense of material breach, the Trustee contends that summary judgment must nonetheless be denied because genuine issues of fact exist as to the materiality of Sage's alleged breach. For example, the Trustee contends that Continental was not, in fact, deprived of a key benefit under the Contract, because Sage continued to provide the efficient delivery of goods after the November 21, 2003 announcement. The Trustee contends that Continental's flight schedules were not impacted and that there was no prospect of a break in supply, as the Suppliers did not make demands on Continental for payment or threaten to stop doing business with Continental.

With respect to Count II, Continental contends that there was no "account stated," because it clearly and unequivocally objected to paying the sums at issue to Sage. According to Continental, the Trustee cannot establish an express or implied promise to pay, because Sage knew of Continental's objection and knew that Continental was paying the Suppliers directly.

Again, with regard to its counterclaim, Continental contends that by paying the Suppliers directly, it provided "assistance" to them within the meaning of ¶ 19A of the Contract, thereby entitling Continental to the liquidated damages specified therein. The Trustee contends, *inter alia*, that direct payment was not the type of "assistance" contemplated in ¶ 19A; indeed, the provision itself states that the damages will be payable when Suppliers "require the assistance of [Continental] *for payment from [Sage].*" (Emphasis added.)

### Discussion.

Under Fed.R.Civ.P. 56 (applicable herein by virtue of Fed.R.Bankr.P. 7056), summary judgment is to be entered where the pleadings, depositions, answers to interrogatories, and admissions on file, together with any supporting affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The task on a motion for summary judgment is to determine whether there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986); *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115, 117 S.Ct. 957 (1997); *Waukesha Foundry, Inc. v. Industrial Engineering, Inc.*, 91 F.3d 1002, 1007 (7th Cir. 1996). On such a motion, it is not the court's function to resolve factual disputes or to weigh conflicting evidence. *Id.* Summary judgment is proper when there is only one logical conclusion to be reached by the finder of fact. *Marozsan v. United States*, 90 F.3d 1284, 1290 (7th Cir. 1996), *cert. denied*, 520 U.S. 1109, 117 S.Ct. 1117 (1997).

The party moving for summary judgment has the initial burden of "informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). Once the moving party meets its burden, summary judgment is proper if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

Addressing Count I, the court need not reach the issue raised by the Trustee as to whether the UCC applies in this case, because even if it does not, there are genuine issues of material fact with respect to Continental's common law defense, i.e., that performance was excused by Sage's material breach.

It is a "fundamental principle of contract law ... that when one party to a contract commits a material breach of that contract, the other party is discharged or excused" from further performance. *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994).[2] In *Hernandez*, the plaintiffs' daughter was killed while riding as a passenger in an automobile negligently driven by a nineteen-year-old boy whose only asset was a $25,000 liability policy with State Farm Mutual Automobile Insurance Company. The daughter was covered under her parents' insurance policy with Gulf Group Lloyds, which included uninsured/underinsured motorist coverage of $100,000. Several weeks after the accident, Plaintiffs settled with the boy for the limits of his State Farm policy, without first obtaining Gulf Group's consent. They thereafter sought to recover from Gulf Group under the underinsured motorist coverage, and Gulf Group denied the claim based on their failure to obtain consent before settlement. *Id.*

---

2    The parties agree that pursuant to ¶ 20 of the Contract, Texas law governs this dispute.

The Texas Supreme Court ruled that the parents were entitled to judgment against Gulf
Group.  Citing to the Restatement (Second) of Contracts § 241(a), the Court stated:

> In determining the materiality of a breach, courts will consider, among
> other things, the extent to which the nonbreaching party will be deprived of the
> benefit that it could have reasonably anticipated from full performance. ... The less
> the non-breaching party is deprived of the expected benefit, the less material the
> breach.

*Hernandez*, 875 S.W.2d at 693.[3]  In upholding the trial court's judgment for the parents (which the

appellate court had reversed), the Court found that because Gulf Group had not been prejudiced by

the breach, the breach was not material.  The Court explained that there might be situations where

an insured's settlement without consent "prevents the insurer from receiving the anticipated benefit

from the insurance contract; specifically, the settlement may extinguish a valuable subrogation

right." *Id.*  Where, however, the extinguished subrogation right has no value, the insurer may not

be deprived of the expected benefit.  "In the latter situation-where the insurer is not prejudiced by

the settlement-the insured's breach is not material." *Id. See also Hanson Production Co. v.

Americas Ins. Co.*, 108 F.3d 627, 630-31 (5th Cir. 1997) (court requires showing of prejudice in case

involving late notice of claim to surplus lines insurer, applying "fundamental principle of contract

law recognized in *Hernandez* that a material breach by one contracting party excuses performance

by the other party, and an immaterial breach does not").

The *Hernandez* court relied primarily on the first Restatement factor in determining

materiality, i.e., the extent to which the nonbreaching party will be deprived of the benefit he

could have reasonably anticipated from full performance. *See Hernandez*, 875 S.W.2d at 693-94.

The complete list of factors is contained in § 241 of the Restatement (Second) of Contracts, as

---

[3]       The Court listed in a footnote the other four Restatement factors (discussed *infra*) for determining
the materiality of a breach.

follows:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
>> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981). The comments to § 241 characterize the first factor--the factor that was the Court's primary focus in *Hernandez*--as "an important circumstance" in determining the materiality of a breach. *Id.* (Comment b); *see also Fedgess Shopping Centers, Ltd. v. MNC SSP, Inc.*, 2007 WL 4387337 at *3 (Tex.App. Dec. 18, 2007) (first factor is "court's primar[]y consideration in determining the materiality of a breach"). The comments describe the second factor, i.e., the extent to which the nonbreaching party can be adequately compensated for the lost benefit, as a "corollary of the first." Restatement (2d) of Contracts § 241, Comment c.

The five Restatement factors were applied by the Texas Supreme Court in *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195 (Tex. 2004), where two pipeline companies each obtained favorable jury findings as to the other's breach of a contract for pipeline construction. *Id.* at 196. Under the contract, Driver Pipeline was to construct 100 miles of pipeline for Mustang in fourteen weeks. During the bidding process, Mustang stressed that time was of the essence. While Driver increased its bid in response to the time demand, it was

nonetheless awarded the contract. *Id.* During construction, Driver fell behind because of extensive rains and then suspended operations to wait for drier weather. Mustang ultimately certified Driver to be in default and contracted with another company to complete the construction. *Id.* at 196-97. Mustang sued Driver to recover for the cost of completion, and Driver countersued, alleging that Mustang had wrongfully terminated the contract, each party alleging material breach. *Id.* at 197. The jury found that both parties had breached and awarded considerable sums to each. Upon cross-motions for judgment notwithstanding the verdict, the trial court entered judgment on the award against Mustang, finding that although Driver had breached, Mustang had failed to establish the reasonableness of its costs of completion. *Id.*

The appellate court affirmed the judgment, reasoning, *inter alia*, that Driver's breach was only relevant if it was material, and because Mustang had failed to obtain an express jury finding of materiality, the trial court was not required to treat the breach as material as a matter of law. In reversing this portion of the ruling, the Texas Supreme Court noted first that the appellate court was correct in holding that a party is excused from further performance under a contract only if the other party's breach was material. *Id.* at 198. The evidence presented at trial, however, had in fact established that Driver's breach was material. After setting forth the five Restatement factors significant in determining materiality,[4] the Court went on to explain that

---

[4]       The Court also noted that the Restatement lists two additional factors significant in determining whether a party's obligations are discharged as a result of the other's party's material breach, i.e.:

> "(1) the extent to which it reasonably appears to the injured party that delay may prevent or hinder him in making reasonable substitute arrangements.
> (2) the extent to which the agreement provides for performance without delay, but a material failure to perform or to offer to perform on a stated day does not of itself discharge the other party's remaining duties unless the circumstances, including the language of the agreement, indicate that performance or an offer to perform by that day is important."

*Id.* at 199 (quoting from Restatement (Second) of Contracts §242 (1981)).

time was of the essence of the contract,--not only because the contract specifically stated that all

time limits were of the essence, but also because numerous other facts established at trial

indicated that the parties intended that time be of the essence. *Id.* at 199-200. The Court held

that when time is of the essence, an express jury finding on the issue of materiality is not

required. *Id.* at 196. Inasmuch as time was of the essence, Driver's breach was material as a

matter of law, and the trial court should have granted Mustang's motion for judgment

notwithstanding the verdict.[5] With respect to the jury's findings that *both* parties had breached,

the Court noted that the problem could have been avoided if the jury had been instructed to

determine who breached first. *Id.* at 200.[6]

Here, Continental's defense is predicated on the assertion that Sage breached the Contract

by not paying the Suppliers "on or before the date that such payment [was] due," as required by

¶ 19A of the Contract. Sage does not dispute that it failed to pay the Suppliers in a timely

fashion. Accordingly, Sage breached this provision of the Contract.

With respect to the materiality *vel non* of that breach, Continental recognizes that Texas

courts apply the five Restatement factors discussed above, and it presents its materiality

argument within that analytical framework.[7] Again, the first factor is the extent to which the

injured party will be deprived of the benefit he reasonably expected, and Continental asserts that

its key benefit under the Contract was "the efficient delivery of goods from its suppliers to its

---

[5]    The Court affirmed, however, the appellate court's holding that Mustang had failed to establish the reasonableness of its costs of completion. *Id.* at 201.

[6]    The Court explained that "[i]n the standard contract dispute, one party cancels the contract or refuses to pay due to alleged breaches by the other; in such circumstances, jurors will often find *both* parties failed to comply with the contract ... unless instructed that they must decide who committed the first material breach." *Id.*

[7]    Continental notes that the Trustee also "does not dispute that the factors listed in Restatement (Second) Contracts § 241 apply to this case." (Reply in Support of Summary Judgment ("Reply Memo"), at 8).

stations." (Supporting Memo, at 7). Continental argues that it was deprived of this benefit because "some of Continental's suppliers wanted their goods back ..., and several ... turned to Continental for payment," thereby exposing Continental to "the prospect of a break in supply." *Id.* According to Continental, it *"had* to pay its suppliers directly to keep its supply lines open." *Id.* (emphasis added). Continental thus ties the prospect of a break in supply to the second Restatement factor (corollary to the first), i.e., "the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived." *Mustang*, 134 S.W.3d at 199. Continental urges that "[c]ollection of damages in the future would not have been adequate compensation if Continental's supply lines had been stopped or disrupted." (Supporting Memo, at 7.)[8]

The only summary judgment evidence, however, that is offered and argued by Continental in support of this break-in-supply contention is the December 15, 2003 Termination Notice executed by Katrina Manning, Continental's "Staff Vice President, Purchasing & Material Services." In that letter, she states that "Continental has been contacted by several suppliers ... to notify Continental that Sage has failed to pay invoices timely and that such suppliers now require Continental to pay those invoices." In her deposition, though, portions of which were submitted by the Trustee as exhibits to his response to Continental's statement of material facts (the "Trustee's Opposition Facts"), Manning testified that she did not write the December 15, 2003 letter; in fact, she did not participate at all in its drafting. Trustee's Opposition Facts, Exh. B, at 72. She testified that Continental's attorneys drafted the letter for her signature. *Id.* Manning further testified that she could not recall any supplier calling her and

---

[8]     Continental reiterates in its Reply Memo that it "would have been seriously harmed by a break in the supply chain." (Reply Memo, at 10).

**-14-**

telling her that he had not been paid for an order delivered prior to Sage's liquidation notice of

November 21, 2003. *Id.* at 62.

Moreover, Robert Greene, the Continental employee who supervised the Sage program

on Continental's behalf beginning in the mid-1990's, testified that although he had been

contacted by most of the suppliers, none of them demanded payment from Continental for the

unpaid invoices submitted to Sage, and none of them threatened to stop doing business with

Continental if Continental did not pay such invoices:

> Q. As of December 15th, 2003, had you personally been contacted by any suppliers of
> Sage with respect to products that Sage in turn sold to Continental with -- on the
> issue of Sage's orderly liquidation?
> A. There was quite a few conversations going back and forth.
> Q. And I'm just talking about were you personally contacted by suppliers?
> A. Yes, sir.
> Q. And how many would you say?
> A. Oh, my Lord. Let's see. What transpired? That was a two-week period between - -
> I would say probably a good majority of the suppliers involved probably contacted
> me, either directly or indirectly, by way of e-mail.
> Q. And how many of those demanded that Continental pay their invoices directly?
> A. Actually, none of them demanded direct payment. They were just curious as to what
> was going to take place from this point going forward.
> Q. Thank you. And how many of those suppliers that contacted you threatened to no
> longer do business with Continental unless they were paid by Continental?
> A. None.

Trustee's Opposition Facts, Exh. D, at 136.

Continental's response to this deposition testimony is that it is not inconsistent with

Manning's December 15, 2003 termination letter, because the letter stated that *Continental* had

been contacted by suppliers complaining of nonpayment, whereas Manning merely "testified that

Continental's suppliers did not complain to *her*." (Reply Memo, at 9-10, n. 6). Likewise,

Greene testified merely "that none of the suppliers threatened *him* with ceasing to do business

[with Continental] unless the outstanding invoices were paid." *Id.* Continental therefore urges

that the deposition testimony fails to establish that the demands were not actually made. *Id.*

The problem with Continental's argument is that the Trustee does not have to establish as a matter of law that the demands and threats were not made; he merely has to show that their occurrence is in genuine dispute. He has provided testimony in support of his contention that no demands were made either to Robert Greene, who supervised the Sage program and was contacted by a majority of the Suppliers during the relevant period, or to Katrina Manning, Continental's Vice President for Purchasing & Material Services. All that Continental has provided is a letter baldly asserting that such demands were made, - - signed by Katrina Manning but written by someone else without her input.

Continental essentially asks the court to speculate as to the "prospect of a break in supply" and the damages that might have flowed therefrom. Again, however, after Sage announced the wind down of its operations, it continued to sell Equipment to Continental, and Continental at times issued orders directly to the Suppliers. Continental acknowledges that its purchasing vice president, Katrina Manning, testified that despite Sage's liquidation, Continental's flight schedules were not impacted by supply shortages caused by Sage's wind down.[9] Based on the current record, including the meager evidence offered by Continental in

---

[9]     Continental also acknowledges that Continental's supervisor for the Sage program, Robert Greene, testified that aside from Sage's alleged failure to perform under section 19 of the Contract (calling for timely payment of Suppliers--erroneously referred to in Continental's Termination Notice as Section 20), Sage performed all other obligations under the Contract. Indeed, breach of timely payment to the Suppliers is the only breach argued by Continental. Again, Continental argues that the breach was material because of the unpaid Suppliers' alleged threats and demands, which form the basis of Continental's "break-in-supply" contention.

While other contentions may have been available to Continental on this summary judgment motion, the court will not construct arguments for the parties or entertain arguments that have not been fully developed. The court notes that Continental attempted a brief further argument in its reply, i.e., that "because timely payment of the suppliers was material to the Contract, Sage's undisputed failure to make these payments when they came due was a material breach." (Reply Memo, at 9.) Not only was this argument--that breach of a 'material term' ipso facto gives rise to a 'material breach'--suggested for the first time in Continental's reply, but it also grossly oversimplifies the law, particularly in light of the Texas courts' adherence to the Restatement factors as guideposts for determining the materiality of a breach. *See also* Williston on Contracts § 43:5, 43:6 (4th ed. 2008). Continental relies, in support of its contention, on *D.E.W., Inc. v. Depco Forms, Inc.*, 827 S.W.2d 379 (Tex.App. 1992), where the court stated that

support of its break-in-supply contention, the court concludes that the Trustee has adduced sufficient summary judgment evidence to show that genuine issues of material fact exist with respect to the materiality of Sage's breach.

Consideration of the remaining Restatement factors does not alter this conclusion. With respect to the third factor, Continental argues that its direct payments to the Suppliers "could not" have caused Sage any forfeiture, because "[a]s a matter of law, Sage had no contractual relationship with [and therefore no liability to] Continental's suppliers." (Supporting Memo, at 8). Continental urges that the Contract expressly designates Sage as Continental's agent and that Continental was Sage's disclosed principal. Continental further contends that Sage admitted the agency relationship by admitting ¶ 9 of Continental's statement of material facts, which stated: "Continental selected its own suppliers and equipment, and Continental's suppliers understood that Sage would be acting on behalf of Continental in purchasing equipment under the Contract."

Under Texas law, labels in a contract do not conclusively establish the existence of an agency relationship. *Daily Intern. Sales Corp. v. Eastman Whipstock, Inc.*, 662 S.W.2d 60, 63 (Tex.App. 1983). The legal effect of the parties' relation is determined not only from contractual provisions, but also from the facts surrounding the relationship. *Id.* As Continental acknowledges, the "'right of control is "the supreme test" in establishing an agency relationship.'" (Supporting Memo, at 8, quoting from *First Nat'l Acceptance Co. v. Bishop*, 187 S.W.3d 710, 714 (Tex. App. 2006)). The principal must have "both the right to assign the agent's task and the right to control the means and details by which the agent will accomplish the

---

"reciprocal promises in a contract, absent intentions to the contrary, are presumed to be mutually dependent and the breach of one will excuse the performance of the other." *Id.* at 382. However, in *Depco*, not only were the promises clearly dependent, but time was also of the essence of the contract. Where time is of the essence, a failure to timely perform is material as a matter of law. *See Mustang*, 134 S.W.3d at 196, 200.

task. ... The principal's extent of control over the details of accomplishing the assigned task primarily distinguishes the status of agent from that of independent contractor." *First Nat'l Acceptance*, 187 S.W.3d, at 714 (citing *Lyons v. Lindsey Morden Claims Mgmt., Inc.*, 985 S.W.2d 86, 90 (Tex.App. 1998)). Accordingly, "even though one acts for and in behalf of another, if he is not under that other person's control, the relation of agency does not exist." *Daily Intern. Sales Corp.*, 662 S.W.2d at 64.

Under these principles, the fact that the Contract refers to Sage as "act[ing] as [Continental's] agent by providing planning inventory, purchasing, warehousing, and distributing services" is not dispositive. Nor has Sage admitted an agency relationship--as urged by Continental--merely by admitting that the Suppliers understood it would be acting "on Continental's behalf" in purchasing Equipment.

Although Continental urges that the Contract "vested Continental ... with exclusive control over the equipment that Sage was required to purchase" (Supporting Memo, at 8; Continental Statement of Material Facts ¶ 8, at 2), the only summary judgment evidence cited by Continental in support of this assertion is the deposition testimony of a Sage principal that Continental "stations" had input as to the quantities of product to be shipped by Sage to such stations. (Continental Statement of Material Facts, Exh. 3, at 67).

The summary judgment evidence adduced by the Trustee tends to controvert Continental's assertion of exclusive control. While the Trustee admits that Continental selected its own suppliers and Equipment, he asserts in his Statement of Additional Facts (the "Trustee's Additional Facts")--and Continental admits--that Sage did not wait for purchase orders from Continental before Sage purchased (and financed the purchase of) Equipment from the Suppliers. Sage would anticipate Continental's needs and warehouse sufficient Equipment to meet those

needs, so that it would be available for Continental's stations, when required. The Suppliers issued invoices for the Equipment directly to Sage, and Continental never received copies of the Suppliers' invoices. According to Manning's deposition testimony, Continental was "not involved with the Sage process of receipt from suppliers." (Trustee's Opposition Facts, Exh. B, at 42). And Greene testified that Sage had some control over its payment terms with the Suppliers, including timing and discounts; it was "not for [Continental] to manage. ... [T]hat's between them and the supplier." (Trustee's Opposition Facts, Exh. D, at 102-03). In short, the summary judgment evidence does not establish as a matter of law--as urged by Continental--that Sage was merely an agent, with no liability to the Suppliers.

In this regard, the Trustee contends that Sage suffered considerable forfeiture as a result of the loss of approximately $2.3 million owed to it by Continental at a critical point in the wind down of its operations. In response, Continental points to the fact that the Trustee is unaware of any pending claims filed by Suppliers against Sage for the amounts that Continental paid--and the Trustee seeks--in this lawsuit. However, the Suppliers would not hold any such claims precisely because Continental paid them directly. Indeed, Continental's professed belief that Sage had no obligation of its own to the Suppliers is belied to some extent by Continental's assertion that "Sage faced no corresponding liability *once* Continental paid its suppliers." (Reply Memo, at 10).

The last two Restatement factors weigh in opposite directions. While it is unlikely that Sage would be able to cure its failure to pay the Suppliers,[10] there appears to be little question--

---

[10]    The Trustee acknowledges that if Continental had paid Sage instead of directly paying the Suppliers, the Suppliers might have received only 30 to 40 cents on the dollar in Sage's liquidation.

based on the current record--that Sage at all times acted in good faith.[11]

Again, based on the application of the Restatement factors as set forth above, the court concludes that the Trustee has adduced sufficient summary judgment evidence to show that genuine issues of material fact exist with respect to the materiality of Sage's breach. Accordingly, Continental's motion for summary judgment will be denied as to Count I.

Continental's request for summary judgment will also be denied with respect to its counterclaim for liquidated damages under ¶ 19A of the Contract. Again, that provision contains Sage's promise to pay the Suppliers timely, and the relevant language for purposes of the counterclaim is as follows: "If suppliers require the assistance of [Continental] for payment from [Sage], [Sage] shall pay [Continental] liquidated damages of $75.00 per occurrence plus 1% of the overdue balance to the applicable supplier to [Sage], unless [Sage] has made, in [Continental's] opinion, all reasonable attempts to resolve any disputed invoices." Both parties characterize the provision as a liquidated damages clause that provides an incentive to Sage to pay Suppliers in a timely fashion. (Opposition Memo, at 15; Reply Memo, at 15); *see Atel Financial Corp. v. Quaker Coal Co.*, 132 F.Supp.2d 1233 (N.D.Cal. 2001) (courts recognize that a liquidated damages provision is not invalid merely because it is intended to secure performance, as long as it represents a reasonable attempt to anticipate actual losses); *see also* 24 *Williston on Contracts* 65:1 (4th ed. 2008) (same).[12]

---

[11]      Continental contends that Sage's attempt to obtain payment from Continental can be viewed as lacking good faith, because Sage's "efforts to collect from Continental were not geared toward Sage turning around and fulfilling its obligation to pay Continental's suppliers. Rather, Sage's intent was to reduce its own, independent debt to its lender,"--a debt guaranteed by Sage's principals. (Supporting Memo, at 10). However, if Sage's lender held a lien on the funds as accounts receivable, Sage would have had no choice but to distribute the funds first to the lender.

[12]      Under Texas law, "[i]n order to enforce a liquidated damage clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991)

Continental contends that the provision should be invoked "precisely because" Sage failed to timely pay the Suppliers. (Reply Memo, at 15). However, the provision is not triggered merely by failure to timely pay; it is invoked "[i]f suppliers require the assistance of [Continental] for payment from [Sage]." Continental has not established as a matter of law that the Suppliers "required" such assistance. As explained above, there are genuine issues of fact as to whether the Suppliers complained to or made demands upon Continental. According to Greene, although a majority of the Suppliers contacted him, none of them demanded payment; "[t]hey were just curious as to what was going to take place from this point going forward." Trustee's Opposition Facts, Exh. D, at 136.

To the extent that the word "require" is susceptible of another reasonable interpretation, e.g., need, as opposed to demand or request, the provision may be ambiguous. Without necessarily making any such finding, however, the court simply notes that even if the clause were deemed triggered by a mere need for assistance, it specifies assistance "for payment from [Sage]." Continental argues that by paying the Suppliers directly, it provided "assistance" within the meaning of the Contract and "[t]herefore" is entitled to liquidated damages under this provision. (Supporting Memo, at 14). According to Continental, "regardless of the manner the payment is accomplished, 'assistance' plainly contemplates help from Continental to achieve some end; in this case, paying suppliers." (Reply Memo, at 15). However, given the language "assistance ... for payment from [Sage]," it is not at all clear that Continental has established as a matter of law the factual predicate for application of this provision, and genuine issues of fact

---

(quoting from *Rio Grande Valley Sugar Growers, Inc., v. Campesi*, 592 S.W.2d 340, 342 n. 2 (Tex. 1979). In light of the court's disposition, it need not determine for purposes of this motion whether these requirements are met.

remain to be tried with respect to Continental's counterclaim. Accordingly, its motion for summary judgment will be denied as to the counterclaim.

Summary judgment will, however, be granted with respect to Count II, i.e., the Trustee's account stated claim. The parties agree that under Texas law, the elements of an account stated claim are (1) transactions between the parties which give rise to an indebtedness, (2) an agreement, express or implied, fixing the amount due, and (3) a promise, express or implied, to pay such indebtedness. *Arnold D. Kamen & Co. v. Young*, 466 S.W.2d 381, 388 (Tex.App. 1971); *Continental Cas. Co. v. Dr Pepper Bottling Co.*, 416 F.Supp.2d 497, 504 (N.D.Tex. 2006); *see* Opposition Memo, at 14; Reply Memo, at 12. While there is sufficient summary judgment evidence as to the first two elements, the Trustee has failed to make a showing sufficient to establish the existence of the third element. Accordingly, Continental's motion will be granted as to Count II.

## CONCLUSION

For all of the reasons set forth above, Continental's motion for summary judgment will be denied as to Count I of the Trustee's Complaint and as to Continental's Counterclaim and granted as to Count II. This opinion constitutes the court's findings of fact and conclusions of law under Bankruptcy Rule 7052. A separate order will be entered concurrent herewith.

Dated:    **NOV 2 5 2008**                     ENTER:

Susan Pierson Sonderby
United States Bankruptcy Judge