### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| SAGE ENTERPRISES, INC., | ) | Case No. 04 B 05548 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| HORACE D. FOX, Chapter 7 Trustee | ) | |
| of the Estate of Sage Enterprises, Inc., | ) | Hon. Susan Pierson Sonderby |
| | ) | |
| Plaintiff, | ) | Adv. No. 04 A 04429 |
| v. | ) | |
| | ) | |
| CONTINENTAL AIRLINES, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter comes before the court on the Amended Complaint of Horace D. Fox, as Trustee (the "Trustee") of the Chapter 7 estate of Sage Enterprises, Inc. ("Sage"), against Defendant Continental Airlines, Inc. ("Continental"). The complaint was brought as against Continental in two counts,[1] the first of which sounded in breach of contract and sought judgment in the amount of $2,510,385.25,[2] plus pre-judgment interest and court costs. As to Count II, which sought the same amount but sounded in account stated, the court previously entered an order granting Continental's motion for summary judgment. Continental's answer asserted numerous affirmative defenses,

---

[1]  Numerous other counts, brought against different defendants, have since been dismissed.

[2]  As discussed *infra*, the parties have stipulated that the amount at issue is actually $2,288,678.31.

-1-

discussed in detail below, as well as a counterclaim (later abandoned) based on a liquidated damages provision in the subject contract.

A trial was held over a four day period, and the parties submitted, *inter alia*, post-trial briefs and responses thereto. The court has reviewed the evidence and the parties' submissions and now rules in favor of the Trustee on Count I. The following comprise this court's findings of fact and conclusions of law.

Sage's bankruptcy was commenced by the filing of an involuntary chapter 7 petition on February 13, 2004.[3] Prior thereto, its business had been the distribution of product to the airline industry. At first, Sage primarily distributed food products to the airlines; but in the late 1980's or early 1990's it began distributing non-food items, such as cups, towels, pillows, and other items needed on board flights. In 1994, Sage secured a contract for the provision of such items to Continental.[4] The contract at issue in this proceeding is the second such contract entered into between Sage and Continental, executed in December 2000, effective for the period January 1, 2001 through December 31, 2004 (the "Contract").

The Contract provided that Sage "shall act as [Continental's] agent by providing planning inventory, purchasing, warehousing, and distributing services (together, the "Services") with respect to certain supplies listed in Exhibit A (hereinafter "Equipment") for the stations listed in Exhibit B." Exh. 9, at 1. Exhibit A to the Contract, captioned "Continental Equipment Master List" (the "Master

---

[3]      An order for relief under chapter 7 was not entered until March 3, 2004, and the Trustee was appointed thereafter.

[4]      Prior to 1994, Sage was already providing food distribution services to Continental.

Equipment List") is a list of suppliers, items, and prices for the "equipment"[5] to be purchased under the Contract, i.e, the cups, silverware, trays, beverage carts, ice buckets, coffee pots, pillows, and other items needed for Continental's flights (collectively, the "Equipment"). Continental selected the Equipment as well as the suppliers (the "Suppliers") from whom it would be purchased. Continental also negotiated the prices that would be paid for the Equipment. It was Sage's responsibility to anticipate Continental's needs and to purchase and warehouse sufficient Equipment so that it would be available when Continental placed an order.[6] To accomplish this, Sage would place purchase orders with the Suppliers, purchase the Equipment, and move the Equipment into its warehouses. The Suppliers issued invoices for the Equipment directly to Sage, and Continental never received copies of the Suppliers' invoices.

Continental would place purchase orders with Sage for Equipment on a regular basis, as needed. The frequency of the orders would depend on the location to which the Equipment was being shipped; the busier the station, the more frequent the orders. Sage would then pull the Equipment from the warehouse and deliver it to the station designated by Continental. The Contract provided that Sage would issue to Continental invoices "for Equipment and Service Fees" on a weekly basis, for the various bundles of Equipment that Sage was delivering to Continental's different locations. Sage ordinarily invoiced Continental every Monday. Pursuant to the Contract, the invoices would be issued at time of shipment, and Continental's payment was due 30 days from receipt of the Equipment or a corresponding correct invoice, whichever was later.

---

[5]     Although these items actually constitute goods, they are referred to in the agreement as Equipment.

[6]     Under ¶ 31A of the Contract, Sage was "required to maintain, at all times, a minimum stock level of thirty (30) days supply ... ."

Sage owned the Equipment while it was in Sage's warehouses. Sage was referred to as "Seller" in the Contract, and Continental was referred to as "Buyer," and title to and risk of loss for the Equipment did not pass from Sage to Continental until Continental actually received the Equipment at its docks or catering stations.

Again, with respect to the "planning inventory" services referred to in the Contract, Sage was to anticipate Continental's needs so that Equipment would be already available and in Sage's warehouses when Continental placed an order for it. Sage would accomplish this by using annual usage forecasts, combined with the lead times stated by the Suppliers (or the actual lead times if they proved, through experience with Suppliers, to be different).[7]

Inasmuch as Sage was purchasing and stocking the Equipment in advance of Continental's needs (and in advance of Continental's ordering and payment therefor), Sage was required to finance the inventory, which it accomplished through a line of credit with its lender, LaSalle Bank, secured by inventory and receivables.[8] A portion of Continental's payment was related to Sage's costs for financing the inventory. Pursuant to the Contract, Continental was to pay Sage not only the price of the Equipment but also a "Service Fee," calculated at 18.2¢ per pound of Equipment shipped.[9] The Contract, in ¶ 29, provides that the Service Fee represents Sage's costs relating to "[h]uman resources, vehicles, building overhead costs, taxes ... , and the cost of financing the inventory." Exh. 9, at 12.

Under its first contract with Continental, i.e., the 1994 contract, Sage had also owned and

---

[7]     Under the Contract, Continental was required to immediately notify Sage of any anticipated changes in usage levels or discontinuance of usage as to any particular item.

[8]     The line of credit was guaranteed by Sage's principals, Shelly Stillman and Gary Greenberg.

[9]     Continental was also to pay certain fuel adjustment charges. Exh. 9, ¶29.

financed the Equipment, and the contract likewise included a per pound "Service Fee." The 18.2¢ per pound fee in the second contract constituted a modest increase from the fee set forth in the 1994 contract.

One of the reasons that Continental first contracted with Sage in 1994 was to relieve itself of the burden of owning and financing the inventory. Prior to 1994, Continental had purchased the Equipment directly from the Suppliers and not only owned and financed the inventory itself, but also handled the warehousing and distribution operation in-house. Materials were brought in to Continental locations, were managed by Continental employees, and were distributed by Continental employees and third-party trucking firms. Through its contract with Sage, Continental was able to outsource the warehousing and distribution operation and avoid ownership and financing of the inventory.

Continental's arrangement with Sage was similar to the arrangement Sage had with Delta Airlines, i.e., Sage purchased, owned, and financed the inventory. However, Sage had a different arrangement with American Airlines and certain other airlines; in those instances, the airline owned the goods in Sage's warehouse, and Sage merely provided the warehousing and distribution services. Sage initiated discussions with Continental on more than one occasion seeking to change the format of their relationship to one similar to the American Airlines arrangement, but those efforts proved unsuccessful.

Again, prior to 1994, Continental had purchased the Equipment directly from the Suppliers, and it had contracts with the Suppliers, the terms of which included, *inter alia*, the specifications for Equipment items that were custom made. Continental continued to have contracts with Suppliers even after it contracted with Sage; however, Sage never received copies of such contracts and was

-5-

not privy to their terms, other than the price of the items, the "pack" (e.g., quantity per unit of issue), and the weight, all of which were set forth on the Master Equipment List. At trial, only four such Continental/Supplier contracts were offered and received into evidence. Ms. Katrina Manning, Continental's Vice President of Corporate Purchasing and Material Services, testified that after Continental contracted with Sage in 1994, it modified its contracts with Suppliers to reflect the Sage relationship. One of the revisions was a "whereas" clause contained, for example, in the Continental/Oneida contract, Exhibit 4, which stated that "Sage ..., as [Continental's] distributor, shall act as an agent of [Continental] in purchasing the Products" from Oneida. Exh. 4, at 1.

In 2003, there were approximately fifty Suppliers from which Sage was required to purchase in the aggregate approximately 400 items of Equipment. Upon order by Continental, as needed, Sage would deliver Equipment to over one hundred Continental locations in the United States (as well as a few overseas locations).

Most of the Equipment items were custom made for Continental, because they had to meet strict size specifications and/or were required to bear Continental's logo. Katrina Manning explained that on an aircraft, there is very little space in the galley, and items have to fit exactly without any wasted space. In addition, Continental's service carts are not standard in size for the industry, and items that reside on the service cart (e.g., cups) have to be exactly the right size in order to fit. As for the logo, Manning explained that in addition to the obvious advertising factor, the logo served a cost control function, because without it, Continental had found that caterers were sometimes using Continental's goods for other airlines.

It was in part because of the custom nature of many of the Equipment items--which would be difficult to sell in the open market--that the Contract included obligations on Continental's part

-6-

to purchase Sage's inventory (with certain exceptions) upon Contract termination.[10]   These

obligations applied, however, to non-custom inventory, as well as to custom made.  In addition to

these obligations, Continental also had an obligation, upon 60 days' notice, to purchase "aged stock,"

generally defined in ¶ 31B of the Contract as "Equipment of the same part number [that has]

reside[d] in all branches of [Sage's] warehouses over 180 days from receipt without any

movement."[11]

Paragraph 19 of the Contract provides invoicing and payment terms for the invoices issued

by Sage to Continental, including invoice format and frequency and the 30-day payment requirement

referenced above.  In ¶ 19A, Sage promised to timely pay the Suppliers, and the parties agreed to a

measure of liquidated damages in the event that Suppliers required Continental's assistance in

obtaining payment from Sage.  That provision states as follows:

> [Sage] warrants and represents that it will pay all suppliers on or before the date
> that such payment is due.  If suppliers require the assistance of [Continental] for
> payment from [Sage], [Sage] shall pay [Continental] liquidated damages of $75.00
> per occurrence plus 1% of the overdue balance due to the applicable supplier to
> [Sage], unless [Sage] has made, in [Continental's] opinion, all reasonable attempts
> to resolve any disputed invoices.

The liquidated damages provision was not contained in the prior contract between the parties.[12]  The

provision was added because there had been problems in the past where a Supplier would complain

---

[10]     The parameters of Continental's obligation to purchase inventory upon contract termination varied depending upon the type of termination, e.g., termination by Continental due to breach by Sage, termination by Continental for convenience, or termination by Sage due to Continental's breach.  Exh. 9, at ¶ 34.

[11]     Manning testified that the Aged Stock provision was seldom used--though she could recall at least one situation between 1994 and 2003 where Aged Stock was purchased.  She further stated that she knew for a fact that at the conclusion of the relationship, Continental purchased Aged Stock.

[12]     Greene testified that with the exception of a few changes, the new contract was essentially the same as the 1994 contract.

to Continental that Sage was not paying an invoice timely, and Continental would get involved as a catalyst or go-between to bring the parties together to reach a resolution. The resolution would ultimately result in Sage and the Supplier agreeing to an amount for Sage to pay on the disputed invoice. The purpose of the liquidated damages clause was to compensate Continental for its time in the event it got involved in any such Sage/Supplier payment dispute. However, despite opportunities to apply the provision, Continental never invoked it until after the events of November 2003 which gave rise to the instant suit.

On November 21, 2003, Sage sent a letter to all of the Suppliers advising that it was going to discontinue operations and wind up its affairs in an orderly fashion. In the letter, Sage noted the dramatic impact of the September 11, 2001 attacks on the airlines and the related catering industry and described the aggressive action Sage had taken to counter that negative impact, including branch closures, lay-offs, and salary cuts. Despite these measures, Sage had continued to suffer large financial losses and concluded that an orderly liquidation was the best solution for all parties. Sage continued:

> As of 11:59PM Thursday, 11/20/03, any payments not made for product already received have been frozen. Unless we hear from you otherwise, we will make payments in normal terms for goods received after 11/20/03 and for new goods we may need in order to help facilitate the orderly wind down of our business and continue to support our mutual airline customers during the upcoming transition.
>
> As a result of our ongoing losses it appears that most of the liquidation proceeds will go to our secured creditors. We will distribute any excess proceeds to our unsecured creditors on a pro-rata basis.

Exh. 14, at 2. Sage sent a similar letter to Continental; however, in lieu of the language quoted above, the letter stated:

> [P]lease be advised that we have frozen all supplier accounts payable due at this

time.  Going forward, we will of course abide by any new payment terms imposed
by the suppliers for new purchases.  We plan to work with you in every reasonable
way possible to ensure a smooth/seamless transition.  We request and need your
reciprocal support to insure that your caterers, suppliers and your new distribution
company cooperate in a similar reasonable and fair manner.  A key objective in
this orderly liquidation process is to minimize any disruption in your service.

Exh. 15, at 2.[13]

Rob Greene received copies of these letters from his co-workers on Monday, November 24,

2003--the Monday before Thanksgiving.  In conference calls that day with Sage representatives and

other Continental employees, the details of the November 21st letters were reviewed, and Shelly

Stillman, a Sage principal, provided an overview of Sage's orderly liquidation plan.  He explained

that while existing Supplier payables had been frozen, Sage would pay for any product purchased

from the Suppliers after November 20 to keep operations going during the transition period.  Greene

testified that it was his understanding that Sage was doing everything to maintain "business as

usual," to ensure the continued delivery of Equipment to Continental and avoid any disruptions in

service.  According to Greene, Stillman explained that Sage was attempting to avoid a bankruptcy,

with its substantial attendant costs, and that it was important to the orderly liquidation that

Continental continue to pay Sage for Equipment deliveries going forward and that such payments

be on time.  Greenberg, another Sage principal, testified that Sage hoped to be able to pay 50 to 60%

of the frozen Supplier payables, assuming that its inventory could be sold and the receivables

collected from the airlines.

Again, Greene received copies of the November 21st letters on the Monday before

---

[13]    The letter also states that it constitutes Sage's 90-day notice of contract termination "per
Amendment 2 dated 12/30/00 of our food distribution contract."  The food distribution contract was separate from
the contract at issue here, which relates to the distribution of Equipment.

Thanksgiving, which is the busiest travel time of the year for the airline industry, when the need for supplies is high. While additional Equipment needs to be available to support the additional traffic, both Manning and Greene testified that regardless of the timing of Sage's liquidation announcement the previous Friday, Continental's stations would have assured that enough material was already on hand for the Thanksgiving travel period. And according to Greene, product would need to be in-house at Sage well before November in any event to support the holiday traffic.

In addition to the Equipment already on hand at Continental's stations, Sage continued to sell Equipment to Continental after November 21, 2003, and Continental accepted such Equipment and was invoiced for it by Sage. While some of the Suppliers served reclamation demands upon Sage, reclamation was refused because the Equipment sought to be reclaimed was subject to the lien of Sage's secured lender, LaSalle Bank.

On December 8, 2003, Manning reported in an email to her supervisor, Mark Moran, that "[w]e have not experienced shortages of food or equipment on Continental flights as a result of this business situation." Exh. 25. Again, Sage was continuing to sell Equipment to Continental, and Continental had "work-arounds" established for any additional Equipment that might be necessary, both through direct delivery from Suppliers and through the Michael Lewis Company, whom Continental had tentatively selected as an alternate distributor "under terms similar to the Sage agreement ([Michael Lewis] to own product and bill as shipped, pricing negotiated)." Exh. 25. Continental notes in its post-trial memorandum that, "[a]s Manning testified, the lack of shortages in that two week period was unsurprising as equipment should have been in place, or staged and readily available, for that period. ... However, Continental continued to be concerned about long-term equipment supply and needed to ensure that product continued to move through the system."

Continental Proposed Findings, at 8-9.[14]

To ensure that long-term supply, Continental ultimately contracted with the Michael Lewis Company. Continental began discussions with Michael Lewis as early as November 24, 2003, immediately after learning of Sage's liquidation announcement. According to Greene, at that point, Continental was merely "getting a feel for what's out there," looking at both its short-term and long-term options. Greene testified that Michael Lewis Company did handle Equipment distribution for other airlines, and Manning noted that Michael Lewis was the most logical person to fill the breach. Again, while the agreement referenced in Manning's December 8, 2003 email to her supervisor was a tentative agreement--intended to ensure that there were no short-term supply shortages--Continental ultimately launched a new program with Michael Lewis Company to ensure its long-term Equipment needs.

Two days after Manning's email, on December 10, 2003, Continental representatives, including Manning, Greene, and a host of other Continental employees, met with Sage representatives, including principal Shelly Stillman. Sage representatives discussed the history of Sage, the events that had impacted their business, their efforts to remain viable, and the need to discontinue operations. They made it clear that they wanted to avoid bankruptcy, with its attendant costs, and they made a commitment to support Continental during the transition period. Greene testified that Sage still expected Continental to purchase Equipment at that time, and Continental made a commitment to do so; it committed to purchasing the balance of inventory at Sage. According to Manning, Continental advised at the December 10 meeting that there would be funds

---

[14]    As indicated above, most of the Equipment items were custom made, because they had to meet strict size specifications and/or were required to bear Continental's logo. As a result, they were not shelf stock items readily available from other suppliers, and lead time would be needed to ensure availability.

set aside, as a setoff against what Continental owed Sage, in order for Continental to pay the

Suppliers for the Equipment that had not been paid for by Sage. Manning further testified that Sage

did not raise an objection to such proposed payment to the Suppliers, either at the December 10

meeting or at any time thereafter. Greene, on the other hand, could not recall Continental advising

Sage at the December 10 meeting about any such setoff or withholding of funds as to unpaid

Equipment.

After December 10, 2003, Continental continued to purchase Equipment from Sage, and Sage

continued to invoice Continental at the customary price, including both the Equipment cost and the

service fee described above. Then on or about December 15, 2003, Continental transmitted to Sage

a letter (the "Termination Notice") purporting to terminate the Contract immediately for cause,

pursuant to the first sentence of ¶ 34A thereof.[15]  In the Termination Notice, Continental references

Sage's letter of November 21st announcing its orderly liquidation and freeze of payments to Suppliers

for Equipment received prior to that date. Continental then sets forth the language from ¶ 19A of

the Contract, as quoted above, concerning Sage's warranty of timely payment to Suppliers and the

liquidated damages to which Continental would be entitled in the event that it had to get involved

in a Sage/Supplier payment dispute. Continental then states:

> Since the [November 21, 2003] Memorandum was issued, Continental
> has been contacted by several suppliers from which Sage was purchasing prod-
> ucts to distribute to Continental under the Agreement, to notify Continental
> that Sage has failed to pay invoices timely and that such suppliers now require Con-
> tinental to pay those invoices. In light of the Memorandum, these circumstances
> and our prior discussions and meeting on this topic, Sage has breached, and con-
> tinues to breach, the Agreement and Continental has and continues to incur direct,

---

[15]    The court notes that termination pursuant to the first sentence of ¶ 34A requires that Sage be given
an opportunity to cure within 30 days of notice. No mention is made in the Termination Notice of such a cure
period.

incidental and consequential damages as a result of these breaches.

> Accordingly, Continental is terminating this Agreement for cause, effective immediately, pursuant to the first sentence of Section 34A. of the Agreement.

> Continental hereby exercises its right to set-off and hereby sets-off $1,991,696 for damages it has incurred, and it is hereby off-setting deducting all other direct, incidental and consequential damages it has or may incur from any amounts owed to Sage under the Agreement.

Exh. 28.

The Termination Notice was signed by Katrina Manning but written by Continental's legal department. Although Manning states in the Termination Notice that Continental has been contacted by several Suppliers who "require Continental to pay [the] invoices" that Sage has failed to pay, Greene testified that while most of the Suppliers contacted him (or members of his team) after Sage's liquidation announcement, no Supplier demanded that Continental pay Sage's debt for Equipment. Manning likewise acknowledged that while the Suppliers were "ringing the phone off the hook," she was not personally aware of any Supplier who contacted Continental between November 21 and December 15, 2003 to notify Continental that Sage had failed to pay invoices timely and that they now required Continental to pay those invoices. Transcript, at 270-271. Indeed, during Greene's tenure as manager in charge of overseeing the Sage Equipment program, the Suppliers had never asked Continental to pay an invoice that they had issued to Sage or looked to Continental to guarantee Sage's payments. Greene testified that the way the contract was written, Continental could not have "used its money to pay the invoices that the suppliers had issued to Sage;" "[t]hat's not the way it was designed." Transcript, at 334.

Greene further testified that while Continental did, from time to time, receive complaints from Suppliers about Sage not paying invoices timely, Continental never paid a Supplier directly on

those invoices. Manning likewise testified that prior to the payments made in 2004, as discussed

further below, Continental had never paid a Supplier directly for goods that Sage had purchased from

Suppliers and sold to Continental. In fact, even after the events of September 11, 2001, when Sage

had to freeze its accounts payable to Suppliers due to the precipitous drop in airline travel,

Continental did not make any direct payments to the Suppliers and never told Sage that Continental

had any such obligation. To the contrary, Continental told Greenberg, Sage's principal, what

Greenberg had expected, i.e., that it was Sage's responsibility to pay the Suppliers and that Sage

needed to work it out with the Suppliers on its own. Sage ultimately repaid the frozen accounts

payable over a six- to eight-month period.

      Manning also confirmed that no Suppliers were paid directly by Continental after the events

of September 11, 2001 and that none of the Suppliers contacted Continental at that time and asked

Continental to pay the invoices they had issued to Sage. Manning acknowledged that the Contract

does not contain language stating that Continental was obligated to pay the Suppliers in the event

that Sage failed to pay, and she testified that she was aware of no other agreement that contained

such language. Nonetheless, Manning testified that because the Contract referred to Sage as

Continental's agent, she believed that Continental always had a direct liability to the Suppliers for

the invoices that Sage failed to pay.[16]

      The $1,991,696 figure referenced in the Termination Notice "represented the amounts

Continental *believed* were due from Sage to suppliers" for Equipment that Sage had received but not

paid for. Continental Proposed Findings, at 10 (emphasis added). The amount was based merely

_____

[16]     Manning also testified that with respect to the Continental/Supplier contracts, which referred to
Sage acting as agent of Continental for procurement purposes, it was her belief as a businessperson that Continental
was obligated to pay the Suppliers if they were not paid by Sage.

on Continental's "belief" because Continental did not track Sage's accounts payable to its Suppliers. Continental never received copies of the Supplier invoices and had no way of knowing whether Sage was even past due--much less the amount of any delinquency. As Manning acknowledged, Continental could not have put together an account payable listing if it had wanted to. She further testified that Continental did not account on its books for the contingent liability that she believed Continental owed to the Suppliers. Indeed, Greene testified that the Suppliers did not *have* accounts receivable from Continental.

The $1,991,696 figure was based on a list that Continental obtained from Sage. Exhibits 23, 66. Manning had told Sage's principal Shelly Stillman that she needed a detailed list of the Supplier payables in order to reconcile the amounts owed. According to a December 16, 2003 email from Stillman to, *inter alia*, Greenberg, which Manning characterized as an accurate summary of her conversation with Stillman, she further advised that Continental was going to continue to hold approximately $2 million, net of Sage's charges and taxes, until the Suppliers were paid. Exh. 66. "She reiterated that it was [Continental's] intention to pay Sage 100% for everything that they buy from [Sage] over and above this vendor hold." Exh. 66. Stillman concluded the email by advising that the quicker Manning could get the vendor amounts reconciled, the faster Continental would pay the rest of Sage's Equipment invoices.

Stillman then obtained the list of Suppliers and amounts from Rick Roller, Sage's vice president of accounting, who cautioned Stillman to advise that "the amounts are preliminary and subject to some change as we clarify what is due." Exh. 66. The list did not indicate whether the amounts were either due or past due. Nonetheless, Continental asserted a setoff of the full

$1,991,696 in its Termination Notice.[17]  Manning testified that these funds were to be used to pay Suppliers for the invoices that Sage had not paid.

After transmittal of the Termination Notice, Continental continued to purchase Equipment from Sage, and Sage continued to invoice Continental at the customary price, including both the Equipment cost and the service fee.  Greene testified that it was his understanding that Continental continued to pay Sage on normal terms, "trying to run ... , for lack of a better term, ... business as usual in that area with regard to invoices."  Transcript, at 405-406.  Manning testified that Continental paid Sage the full invoice price for everything delivered after December 15, 2003, regardless of whether Sage had paid the Suppliers for such items.  She explained that it would be impossible to determine whether particular Equipment items had been paid for by Sage or not, and since sufficient funds had already been set aside to pay the Suppliers, Continental simply paid the full price for all deliveries after December 15, 2003.[18]  Continental continued to purchase Equipment from Sage for an extended period, at least through the end of December.  Ultimately, Continental purchased all the Equipment that Sage had in inventory.

While Continental originally set aside the sum of $1,991,696 to pay Suppliers, the amount actually changed over time as more information was obtained.  On or about December 29, 2003, Greene sent a letter to the Suppliers, requesting that they "begin the process of developing a summary invoice and gathering the supporting paperwork," e.g., invoices and proofs of delivery, for

---

[17]      According to Manning, the Termination Notice--though dated December 15, 2003--may actually have been transmitted on December 16, 2003, after her conversation with Stillman.

[18]      Greene testified that there was a slight discount as to the last two truckloads of Equipment, which were picked up by Continental trucks.  Accordingly, Sage's cost of trucking (approximately five cents per pound of Equipment) was deducted from the service fee.

-16-

Continental's review. Exh. 30.[19] Greene advised in the letter that Continental was also requesting

from Sage a detailed accounts payable listing by supplier,[20] and he stated: "As soon as this

information is received from Sage, we will in turn contact each supplier for invoice comparison and

discussion in an effort to reconcile any discrepancies." *Id.* Continental asked for Sage's assistance

in the reconciliation process, so that Continental could determine an exact figure for the outstanding

amounts owed to the Suppliers. Sage cooperated in the reconciliation process, which lasted from

December 2003 to November 2004 and involved, *inter alia*, weekly conference calls between

Continental employees and Sage employees every Wednesday morning. Greene testified that the

parties' interaction in this process was friendly and that Continental and Sage "were both working

towards the same goal, and that was to match up the paperwork and reconcile the various invoices."

Transcript, at 442-443. According to Greene, Sage understood that the faster the reconciliation, the

faster moneys would be released to Sage.

   Greenberg confirmed that Sage cooperated fully in the reconciliation process, providing

Continental with information concerning Supplier payables, as needed. He testified that he

continued to work with Greene for months after Sage physically closed its doors at the end of

February, 2004, so that the full balance due might ultimately be collected from Continental.

---

[19]    The December 29 letter also advised Suppliers that Continental was securing a new distribution
program with Michael Lewis Company. In the letter, Greene stated that the new program would "launch
immediately after the first of the New Year," though he claimed at trial that Continental had not, as of December 29,
2003, secured such a program. Transcript, at 410.

[20]    Sage had previously sent, on December 12, 2003, an "update" letter to the Suppliers, advising of
the progress of the orderly wind-down and suggesting that they submit to Sage a detailed listing of what their records
indicated was owed by Sage. The letter stated that the amounts would be reconciled with Sage's own records to
insure an accurate pro rata distribution of funds remaining after payment of Sage's secured lender.

Greenberg acknowledged that he was aware of the holdback of funds.[21] He nonetheless testified that it was his hope that if Sage cooperated fully in the reconciliation process that Continental might ultimately decide to pay the balance of Sage invoices in full. He stated that he and Greene avoided talking about any such payment by Continental or whether it would ultimately be made. Instead, according to Greenberg, they had an understanding that that issue would be left to the lawyers, as Greene had advised that he had no control over it in any event.

As portions of the reconciliation were completed, Continental paid the Suppliers whose invoices had been reconciled and paid Sage its corresponding service fees plus the price of Equipment for which Sage had paid. The first of these payments to Sage was made by check dated January 14, 2004 in the amount of $1,499,483.60. The check stub stated "PARTIAL SETTLEMT" and was accompanied by a typewritten note, stating:

> As you are aware, Continental has been offsetting amounts that it owes to Sage in order to cover damages that Continental has incurred as a result of Sage's breach of the Equipment Distribution Agreement (the "Agreement"). It now appears that the amount that Continental has offset may exceed the amount of Continental's damages from the breach. Without waiving any rights that it may have under the Agreement at law and/or in equity, Continental is prepared, as a show of good faith, to pay Sage $1,499,483.60. This amount represents the Service Fee ($318,353.19), the one percent surcharge ($1098.73), miscellaneous ($1790.37), fuel surcharge ($27,634.45) and certain taxes that are owed to the State of New Jersey ($82,400.76) invoiced by Sage as of December 23, 2003. The balance of the payment is for amounts invoiced by Sage to cover the cost of equipment sold to Continental, for which Continental believes Sage has

---

[21]     Greene testified that he had prepared a list, which was updated periodically, entitled "Sage 'Held Back' funds." It showed, *inter alia*, amounts paid to each Supplier and amounts in process for payment, and a copy, "Updated: 7/28/04," was received in evidence as Exhibit 52. According to Greene, he created the document to use as a quick reference "to keep track of how [he] was progressing with regard to ... the suppliers," and he said that he "kept Sage apprized as to what suppliers were being taken care of, if you will." Transcript, at 431-432, 441. According to a May 20, 2004 email from Roller to Mitchell Tarvid at LaSalle Bank, however, no one at Sage could actually validate whether funds were in fact paid by Continental to the Suppliers. Exh. 48. Roller explained in his email that "control of the reconciliation between the suppliers and what Continental says they are paying the suppliers lies at Continental. At this point Continental only contacts Sage (Deidre') when a proof of delivery or unpaid invoice issue arises when they (Continental) attempt to reconcile what is due the supplier." *Id.*

-18-

previously paid the original vendor. Enclosed is a check in the amount of $1,499,483.60. The attached spreadsheet provides a more detailed description of how payments have been applied.

If you have any questions concerning the above, please let me know.

Exh. 33. The spreadsheet that was included with the check and the above note contained a detailed listing of the Sage invoices on which payment was being made, designating as to each, *inter alia*, the amount of the Service Fee being paid and the amount of the Equipment cost being paid, if any.

Again, as the reconciliation progressed, Continental paid the Suppliers whose invoices had been reconciled, and these payments began sometime in or about February of 2004. It was Greene's responsibility to obtain a release from each Supplier before issuing payment; none of the Suppliers were paid until after the release letter was signed. Greene wrote the release letters with the assistance of Continental's legal department, and he signed each one. He testified that the payments to Suppliers were issued in each case within five days of receiving back the signed release letter. Approximately 45 Suppliers signed the release letter; the few who did not sign (or did not respond at all) were not paid.[22]

As indicated above, Continental did not carry an account payable to the Suppliers on its books after 1994, when Sage took over the purchase and distribution of Equipment. However, early in the reconciliation process, sometime during December of 2003 or January of 2004, Manning (and/or one of the employees in her department) advised Continental's accounts payable team that they needed to set up an account payable to the Suppliers with respect to the Suppliers' invoices to Sage that were being reconciled. The account was actually set up sometime after January 20, 2004.

---

[22]     The one exception would be Global Inflight Products, which had previously received a partial payment from Continental in the amount of $156,761.92; the balance of $7,529.76 remained in dispute.

By the end of July, 2004, Continental had paid the Suppliers over $2 million.[23] However, notwithstanding these payments to the Suppliers, Continental continued to maintain on its books accruals sufficient to cover the full amount of the charges so paid. Greene testified that the purchasing department does not itself have a budget that covers payments for the Equipment. The "end-user" departments, i.e., the departments that actually use the Equipment (in this case the Food Service and Aircraft Appearance Departments), are the departments that get charged for the Equipment and pay for it out of their budgets. Over the years, the invoices from Sage to Continental would be allocated to the appropriate end-user department and paid for out of that department's budget. And each department, in anticipation of getting charged for Equipment, would "accrue a certain amount. They basically set up a bank, if you will." Transcript, at 421. Again, notwithstanding Continental's payment of over $2 million to Suppliers from approximately February through July of 2004 for Equipment that Sage had delivered to Continental, the end-user departments did not release any of the accruals for the subject Equipment, but continued to maintain sufficient reserves in their budgets to cover the full amount of the charges for which those payments had been made.

During the reconciliation process, Continental was also making payments to Sage. After the initial payment of $1,499,483.60 on or about January 14, 2004, as discussed above, Continental made five more payments to Sage, as follows: $350,100.12 by check dated February 9, 2004, $299,942.50 by check dated February 19, 2004, $463,055.04 by check dated April 6, 2004, $141,473.39 by check dated June 16, 2004, and $11,013.34 by check dated November 22, 2004.

---

[23]     Prior to these payments--made during the course of the reconciliation process--Continental had never paid a Supplier directly for invoices issued by the Suppliers to Sage.

These payments totaled $2,765,067.99 and represented the service fees calculated in accordance with the Contract as well as the price of Equipment for which Sage had already paid the Suppliers.

When Greene sent the $11,013.34 check to Sage "[b]y way of Fed Ex" on Friday, November 19, 2004, he also sent an email to Rick Roller at Sage, stating:

> By way of FedEx ... I am sending in the amount of $11,013.34. This amount represents all known open invoices matched for payment to date and showing an unmatched amount of $4.03. A detailed spreadsheet reflecting various payments to date is attached. According to our records, this should close to [sic] books on funds owed by Continental to date.
>
> I do however still have your invoice for $1,684.37 dated 10/10/03 ... . I have searched my files as well as checked with FoodService and Account's Payables and there is no record of this invoice in our systems. Therefore, I must ask you to go through your files and provide back up for this invoice amount before we can take any further action.
>
> Please confirm your receipt of this message.

Exh. 59. On Monday, November 22, 2004, Roller sent Greene an email that simply stated: "I have received your Fed-Ex containing the $11,013.34 check." Exh. 59. Greene then promptly sent an email to Manning, forwarding Greene's November 19 email and Roller's response, stating: "Closure w/Sage appears to be official as there's no rebuttal attached to the message below." Exh. 58. Minutes later, Manning responded: "I noticed that too!" When asked what rebuttal she was expecting, Manning stated that if Sage did not see this last payment as a "close out of the Sage business," they would have objected. Transcript, at 305.

Shortly after his email to Manning, Greene also sent an email to Mary Drugovich, a Continental accounts payable supervisor, again forwarding Greene's November 19 email and Roller's response and stating:

> It appears that Sage has accepted our final check as there's no rebuttal to my message of 11/19/04. With that said we can probably advise the end-user's to

-21-

release the accrued funds supporting this program.

...

Happy Holidays Indeed/Rob

Exh. 59.  Greene admitted that up to that point, the end-users had been accounting for over $2

million to be paid to Sage:

> Q.    [H]ow did Sage's acceptance of the $11,000 payment give the end-users the
> opportunity to release the accrued funds, if you could explain that?
>
> A.    Again, all it really does is give the end-users the - - you know, they can take
> basically, for lack of a better term, take a sigh of relief in that say they had $50,000
> set aside for funds that they're going to get charged for from 2003.  It allows them
> to be able to, shall we say, explain a variance going into 2004 with their budget.  So
> it's really you're just rolling over a dollar amount that will hit them at a later date.
>
> Q.    Okay.  So were the end-users accounting for over $2 million at that point to be paid
> to Sage?
>
> A.    Well, it will probably - - you know, between the different departments, I would say
> yes.

Transcript, at 421-422. Thus, despite the fact that Continental had months earlier paid the Suppliers

on account of Equipment for which Sage had failed to pay, Continental's end-user departments

continued to account for over $2,288,678.31 as a potential payment to Sage for the same Equipment.

Again, while Continental never paid Sage the $2,288,678.31 for such Equipment, it paid Sage

during the reconciliation process the six payments discussed above aggregating $2,765,067.99,

representing all service fees plus the price of Equipment for which Sage had paid.  Unlike the

payments to Suppliers, however, Continental paid Sage the entire $2,765,067.99 without ever

obtaining a release.  Instead, Continental placed the designation "PARTIAL SETTLEMT" on the

check stub for the first of its six checks and "PARTIAL SETTLE 2," "PARTIAL SETTLE 3," and

so forth, on the remaining check stubs, the last such stub stating "PARTIAL SETTLE 6."  When

Manning was asked what "settlement" the stubs were referring to, she responded that it was "[t]he

-22-

settlement of the account with Sage and Continental." Transcript, at 302-303. She acknowledged,

however, that there was no settlement "agreement:"

> Q. And at that point, did you believe you had a settlement agreement
> between Continental and Sage with respect to this?
>
> A. Not a formal settlement agreement, not a written agreement.
>
> Q. But you did believe you had a settlement agreement?
>
> A. Yes.
>
> Q. And what were the terms of the settlement agreement?
>
> A. That we would pay the suppliers for what was reconciled between
> Continental and Sage and each supplier, and we would pay Sage a
> hundred percent of the balance.
>
> Q. And when was that settlement agreement reached between Continental
> and Sage?
>
> A. We discussed the setoff in the December 10th meeting. It was not
> objected to. And it was further discussed in the conversation that I
> had with Shelly Stillman, and it was not objected to.
>
> Q. Other than it being not objected to, when did Sage agree to it?
>
> A. I don't have an agreement.

Transcript, at 303. Greenberg confirmed that while he did not voice an objection to Continental's

direct payment of Suppliers, he also never told anyone from Continental that Sage would agree not

to seek full payment on its invoices.

Manning nonetheless testified that she believed the matter had been resolved and that she did

not learn otherwise until Continental was sued by Sage's bankruptcy trustee. The Trustee filed the

instant suit on December 20, 2004, about a month after the last payment was sent to Sage.[24] In Count

I of his complaint, the Trustee asserted that Continental had breached the Contract and he sought

judgment in the amount of $2,510,385.25, plus pre-judgment interest, court costs, and other relief.

(As previously noted, the parties have stipulated that the amount at issue is actually $2,288,678.31,

i.e., the shortfall between the amount invoiced by Sage for Equipment delivered to Continental and

the amount Continental has already paid Sage therefor.) Again, Count II, which sounded in account

stated, was resolved in Continental's favor at the summary judgment stage.

Continental's answer contained numerous affirmative defenses, including, *inter alia*, setoff,

estoppel, and waiver. Continental also asserted a counterclaim for liquidated damages under ¶ 19A

of the Contract, which has since been abandoned.[25] After trial, Continental filed an amendment to

its answer relating to the jurisdiction of this court. In the amendment, Continental admitted that

certain claims in this proceeding are core and others are non-core and stated that to the extent any

part of this proceeding is non-core in nature, Continental consents to the entry of final orders or

judgments by the bankruptcy court.[26]

In its post-trial memorandum, Continental contends, *inter alia*, that Sage was its agent and

---

[24]     Manning claimed that she was unaware that Sage had filed bankruptcy until after the last payments
were made to Sage. According to Manning, she first learned of it from Greene. Greene testified that he first learned
of Sage's bankruptcy in December 2004, but he could not recall how. On July 1, 2004, however, Greenberg
forwarded to Greene an email from Roller that stated, *inter alia*, that Sue (a Sage accounts receivable person) had
been "asked to put together an updated accounts receivable aging for the Trustee ..." Exh. 51. Greene testified that
he read Roller's email and noticed the word "trustee." He stated, however, that although he has a general
understanding of the role of a bankruptcy trustee, the word "trustee" in the email did not suggest to him that Sage
was in bankruptcy.

[25]     Continental states in its post-trial brief: "Given the Trustee's declaration that the Sage estate is
insolvent, Continental is no longer pursuing its own counterclaim." Continental Trial Memo, at 37.

[26]     Continental's amendment was directed to ¶ 7 of the Trustee's complaint, which states that this
adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(E) and (O) and that to the extent any
part of it is non-core in nature, the Trustee consents to the bankruptcy court hearing and finally determining such
matter.

that Continental was therefore directly liable to the Suppliers, as principal, on the invoices that the

Suppliers issued to Sage. According to Continental, to the extent that Sage failed to pay such

invoices, Continental was required to pay them and could set such payments off as damages against

any amounts otherwise due to Sage under the Contract. Continental also argues that the breach of

Sage's obligation under ¶ 19A of the Contract to timely pay Suppliers was a material breach which

excused any further performance by Continental, and it contends that even if the breach was not

material, Continental would nonetheless have a claim for any damages flowing therefrom.

According to Continental, its damages are the payments that it made directly to the Suppliers, as they

were the natural and foreseeable result of Sage's breach. Finally, Continental contends that the

Trustee is estopped from denying that the payments made by Continental to the Suppliers and to

Sage constituted a final settlement between the parties.

The Trustee, in his post-trial brief, contends that the Contract is governed by the Uniform

Commerical Code, as adopted in Texas (the "UCC"), and that Continental cannot therefore assert

its common law defense that a material breach excuses further performance. He further argues that

even if the Contract is not governed by the UCC, Continental's performance is not excused, as

Sage's breach of the Contract was not material. Finally, the Trustee asserts that Continental has

failed to establish an agency relationship and has failed to establish its setoff, estoppel, and waiver

defenses.[27]

---

[27]     After this matter was taken under advisement, Continental filed a motion to supplement its trial
brief. The Trustee filed a response, objecting that the motion constituted an attempt to argue a defense that was
neither pleaded nor tried (anticipatory repudiation). After a hearing, the motion to supplement was denied.

## DISCUSSION

Addressing first the applicability of the UCC to this dispute, the court notes that under Texas law,[28] "[w]hen parties enter into a contract for the sale of goods, Chapter 2 of the Texas Business and Commerce Code [i.e., the UCC] controls [their] conduct." *Glenn Thurman, Inc. v. Moore Construction, Inc.*, 942 S.W.2d 768, 771 (Tex.App. 1997) (citing Tex.Bus.& Com. Code § 2.102). In a sale of goods contract, "the buyer must pay at the contract rate for any goods accepted." *Id.* (citing UCC § 2.607). Acceptance is automatic where the buyer fails to reject the goods within a reasonable time and to seasonably notify the seller of such rejection. *Id.* at 772 (citing UCC § 2.606(a)(2)). In that situation, the buyer is obligated to pay the full purchase price, and "his remedies are limited to damages for breach of warranty under Section 2.714." *Id.* (citations omitted). Significantly, where the UCC is applicable, "it displaces all common law rules of law regarding breach of contract and substitutes instead those rules of law and procedure set forth in the U.C.C." *Id.* at 771. Accordingly, "the common law doctrine that one contracting party is automatically excused from his contractual performance by the prior breach of the other party is wholly inapplicable to a contract for the sale of goods governed by the U.C.C." *Id.* at 772.

The initial question, then, is whether the Contract was a contract for the sale of goods. Under the UCC, goods are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale ... ." UCC § 2.105(a). A "sale" consists of "the passing of title from the seller to the buyer for a price," and a "contract for sale" includes a contract to sell goods in the future. UCC § 2.106(a).

---

[28]    The parties agree that under the terms of the Contract, Texas law governs this dispute. *See* Exh. 9, ¶ 20.

Here, the Equipment that was the subject of the Contract, being movable at the time of identification thereto, clearly constituted "goods" within the meaning of UCC § 2.105(a). Sage owned the goods while they were in Sage's warehouses. Sage was referred to as "Seller" in the Contract, Continental was referred to as "Buyer," and Continental submitted "Purchase Orders" for the goods, as needed. Exh. 9, at ¶ 19A. Title to and risk of loss for the goods passed from Sage to Continental when Continental actually received the goods at its docks or catering stations. Sage would invoice Continental for the goods on a weekly basis, and payment was due within 30 days from receipt of the goods or a corresponding correct invoice. As the Contract thus provided for the passing of title from seller to buyer for a price, it involved "sales" of goods within the meaning of the relevant UCC provisions.

The Contract also, however, called for substantial services to be performed by Sage. Under Texas law, where a contract contains a mix of sales and services, "the U.C.C. applies if the sale of goods is the 'dominant factor' or 'essence' of the transaction." *Tarrant County Hospital District v. GE Automation Services, Inc.*, 156 S.W. 3d 885, 893 (Tex.App. 2005) (citing *Continental Casing Corp. v. Siderca Corp.*, 38 S.W.3d 782, 787 (Tex.App. 2001); *Westech Eng'g., Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 197 (Tex.App. 1992)). In *Continental Casing*, the defendants manufactured mechanical tubing, and the plaintiff was a distributor of mechanical tubing and pipe. The plaintiff claimed that an oral agreement had been reached based on the terms of an unsigned written agreement. According to the plaintiff, the defendants thereafter sold mechanical tubing, contrary to the parties' agreement, directly to certain of plaintiff's customers and also failed to fulfill orders properly submitted by the plaintiff on behalf of another customer. The plaintiff filed suit alleging, *inter alia*, breach of the parties' oral agreement, and the trial court granted the defendants'

motion for summary judgment.

On appeal, the plaintiff argued that the trial court had erred, as there were genuine issues of material fact concerning the existence of the oral agreement and whether it was enforceable under the UCC statute of frauds, i.e., § 2.201. Under that section, a contract for the sale of goods for a price of $500 or more is not enforceable without a writing signed by the party to be charged or by his authorized agent. *Continental Casing*, 38 S.W.3d at 787. As there was no writing signed by the defendants, the appellate court proceeded to determine whether the UCC was applicable to the alleged agreement.

The oral agreement, alleged to contain the same terms as the unsigned written agreement, provided for a mix of sales and services. The court stated that it must therefore determine "whether the dominant factor or essence of th[e] alleged agreement is a 'contract for the sale of goods.'" *Id.* at 787-788. The tubing was without question a "good." However, the unsigned written agreement provided that the plaintiff would "engage in aggressive sales activity in all possible markets in the position as a 'prime customer' of the works without direct commissions, remuneration or specific consideration; *rather, for the materials at a negotiated and agreed price and delivery on a case by case basis.*" *Id.* at 788 (emphasis in original). Thus, the services were not separately compensated, but were to be performed in partial exchange for the goods, at a negotiated price. Moreover, the court noted that the agreement could properly be characterized as a distributorship agreement. While no Texas case had theretofore discussed whether such agreements were "contracts for the sale of goods" under the UCC, the overwhelming majority of jurisdictions considering the question had concluded that they were. *Id.* The appellate court decided to "follow the majority rule in holding that the dominant factor or essence of the alleged [oral] agreement ... was a contract for the sale of

goods" and therefore subject to the UCC statute of frauds. *Id.*

Here, the first paragraph of the Contract between Sage and Continental, labeled "Services Generally," provides that Sage will provide "planning inventory, purchasing, warehousing, and distributing services" with respect to the Equipment listed in the Master Equipment List. Sage is compensated for these services through the "Service Fee." The "quality incentives" offered by Continental in the Quality Incentive Program set forth in ¶ 26 of the Contract are based on the quality of services performed, i.e., in the areas of on-time delivery and ability to complete orders (requiring excellence in inventory planning and distribution services).

The Trustee nonetheless urges that the Contract repeatedly employs UCC terms of art, such as "acceptance," "buyer," "seller," "title and risk of loss," "rejection," and "nonconformity." Trustee's Trial Memo, at 9. While this is true, and while the Contract does provide for "sales" of the Equipment, the dominant aspect of the Contract is its service component. Again, a primary motive for Continental's entry into the relationship with Sage in 1994 was its desire to outsource the warehousing and distribution service aspects of the operation that it had been handling on its own prior thereto. As Continental stated in its post-trial memorandum, Continental's "key benefit under the Contract" was "the efficient and consistent delivery of goods from its suppliers to its stations." Continental Trial Memo, at 24. Indeed, Greenberg essentially acknowledged the predominance of the service component when he testified that Sage's "key responsibility" was to see "that the airline got its product and we delivered it on time and in the right place at the right time." Transcript, at 46.[29] As discussed further below, Continental hired Sage for its expertise in these matters as an

---

[29]    The court notes that while Greenberg also testified that Sage "did consider [itself] a distributor," he acknowledged that it was not a distributor in the "traditional" sense, because it "represented the airline more than [it] represented the suppliers." Transcript, at 31. Again, distributorship agreements are generally considered to be governed by the UCC, as the sale aspect predominates. They ordinarily involve a contract between a manufacturer

experienced logistics provider for the airlines.

As the service component of the Contract predominates, the UCC does not apply to preclude Continental's common law defenses. One of those defenses is setoff. Continental contends first that because Sage was its "agent" in the purchase of Equipment from the Suppliers, Continental is entitled to offset against any amounts owed to Sage the amount of all payments that Continental was required, as Sage's disclosed principal, to make to the Suppliers.

Under Texas law, a "principal-agent relationship is not presumed, and the party asserting the relationship has the burden of proving it." *First National Acceptance Co. v. Bishop*, 187 S.W.3d 710, 714 (Tex.App. 2006). In support of its agency theory, Continental first notes that the Contract refers to Sage as its "agent" for providing "planning inventory, purchasing, warehousing and distributing services" and that the contracts that Continental entered into with the Suppliers also referred to Sage as Continental's "agent." Continental Trial Memo, at 18-19. Under Texas law, such designations in an agreement are "not controlling, and the legal effect of the relation must be determined from the provisions of the contract and the facts of the relationship." *Daily Int'l Sales Corp. v. Eastman Whipstock, Inc.*, 662 S.W.2d 60, 63 (Tex.App. 1983); *see also Townsend v. University Hospital-University of Colorado*, 83 S.W.3d 913, 921 (Tex.App. 2002) (agency relationship "may be found from underlying facts or direct and circumstantial evidence showing the relationship of the parties"). The right of control is the "essential feature" and "supreme test" of an

---

and another party, who is given the right to distribute the manufacturer's products. *See, e.g., Continental Casing; supra; see also Sally Beauty Co., Inc. v. Nexxus Products Co., Inc.*, 801 F.2d 1001 (7th Cir. 1986) (applying Texas law). In *Sally Beauty*, a manufacturer of hair care products contracted with another company for the exclusive distribution of its products throughout most of Texas. In determining whether the contract was governed by the UCC (and therefore subject to certain assignability provisions in UCC §2-210), the Seventh Circuit predicted that the Texas courts would follow the majority of jurisdictions and hold that distributorship agreements are generally governed by the UCC. *Id.* at 1006. That prediction materialized in *Continental Casing*. Again, as acknowledged by Greenberg and as is apparent from the parties' relationship, the contract between Sage and Continental was not such a distributorship agreement.

agency relationship. *Elk River, Inc. v. Garrison Tool & Die, Ltd.*, 222 S.W.3d 772, 782 (Tex.App. 2007); *First National Acceptance*, 187 S.W.3d at 714. "Thus, even though one acts for and in behalf of another, if he is not under that other person's control, the relation of agency does not exist." *Daily Int'l Sales*, 662 S.W.2d at 64. The party claiming an agency relationship must show that the principal "has both the right to assign the agent's task and the right to control the means and details by which the agent will accomplish the task." *First National Acceptance*, 187 S.W. 3d at 714. It is the extent of control over such means and details that "primarily distinguishes the status of agent from that of independent contractor." *Id*. In other words, if the alleged principal has the right to control what shall be done, but not how it shall be done, the purported agent is actually an independent contractor. *Daily Int'l Sales*, 662 S.W.2d at 63-64 (citing *First National Bank v. Bullock*, 584 S.W.2d 548, 551-52 (Tex.App. 1979)).

Continental, in support of its contention that it exercised the necessary control, highlights the fact that it selected the Suppliers and the types of Equipment to be purchased under the Contract and negotiated the prices. While Continental thus had some control over the purchasing aspect of the Contract, it had little control over the "planning inventory, ... warehousing and distributing services" to be provided by Sage. As Continental forcefully argued in connection with the UCC issue, the service aspects of this Contract predominate, and one of the primary services sought to be obtained by Continental's entry into the relationship with Sage was the outsourcing of the warehousing and distribution operation. Again, Continental itself urges that "its key benefit under the Contract" was "the efficient and consistent delivery of goods from its suppliers to its stations." Continental Trial Memo, at 24. Sage's corollary key responsibility was to see that the right Equipment was in stock, available, and delivered to the right place at the right time. There are few provisions in the Contract

governing the means by which Sage was to discharge that key responsibility. One such provision

is ¶31A, which required Sage to maintain at all times a minimum stock level of thirty days' supply.

Beyond that, Continental acknowledges that Sage had discretion with regard to the quantity of goods

to keep on hand. *See* Continental Trial Memo, at 19. It was up to Sage to prepare usage forecasts

to facilitate the determination of the appropriate amounts to stock in its warehouses. While Sage

could refer to Continental's usage figures at the inception of the relationship for its initial stocking

levels, *see* Exh. 9, at ¶ 30, it was to develop thereafter its own usage data based on its experience

operating under the Contract. Sage would estimate the amount of Equipment needed by analyzing

such usage data together with data concerning the "lead time" needed by each Supplier for

production of the Equipment. As explained by Manning, Sage would "utilize the lead time ... stated

by the supplier, and then as they began to provide the material to us, they would build their own

knowledge of actual lead time compared to stated lead time," and then compare it with the usage

forecast to determine appropriate inventory levels. Transcript, at 195. As stated by Greenberg, Sage

made those determinations with its own software programs, i.e., "what volume of product was placed

in what warehouse, and what [Sage] needed for Continental in a given section of the United States."

Transcript, at 38. Location of warehousing was important to the operation, so that Equipment would

be in as close proximity as possible to the Continental stations where it would be needed, and

Continental acknowledges that Sage had discretion in determining where to warehouse Equipment

and in what amounts.

These services relating to the planning of inventory levels and location of warehousing were

integrally related to Sage's ability to complete Continental's orders and deliver on time. They were

not--as characterized by Continental--"merely incidental" matters (Continental Trial Memo, at 19),

but were critical to the performance of Sage's key responsibility of seeing that the right Equipment was delivered in the right quantity to the right place at the right time. Again, the "quality incentives" offered by Continental in the Quality Incentive Program set forth in ¶ 26 of the Contract are entirely based on Sage's performance in the areas of on-time delivery and order completion.

It is clear from the record that Continental hired Sage for its expertise and years of experience in these matters. Indeed, Continental proceeded cautiously in selecting Sage's replacement, i.e., the Michael Lewis Company, "to assure, number one, that they could handle [Continental's] quantities and that they could handle [its] locations, and also be able to come together with all the ... technical software and everything needed to support the whole pipeline, the whole system." Transcript, at 380. Continental relied on Sage's expertise as an experienced logistics provider for the airlines and simply did not control the means by which Sage achieved Continental's key objectives.

Continental also contends that Sage bore little if any risk for the inventory that it purchased under the Contract and that such lack of risk provides support for a finding of agency. Continental states that "[a]lthough Sage did hold title to the equipment delivered to Sage by the suppliers until such time as Sage further delivered the equipment to Continental, the undisputable evidence demonstrates that the [Contract] also shielded Sage from risk associated with holding such title," e.g., through the Aged Stock provisions of the Contract and the provisions requiring Continental to purchase Sage's inventory (with certain exceptions) upon termination. Continental Trial Memo, at 20. Continental goes so far as to suggest that it, not Sage, actually owned the Equipment in Sage's warehouses and that there were really no "sales" of Equipment by Sage to Continental. For example, in response to Debtor's proposed finding that the Contract "contemplated the future sale of Equipment by Sage to Continental pursuant to periodic orders placed by Continental with Sage,"

Continental states that "there was no contemplation of future sales but rather a consistent *transfer of equipment* to Continental by Sage," and "to the extent Continental ever placed an 'order' for equipment ..., it was in an effort to *draw-down* on *Continental's stock* that Sage was required to keep." Appendix A to Continental's Response Memo, at A-1 (emphasis added). Continental urges that there were no "sales" because, *inter alia*, the provisions governing the ordering of Equipment by Continental and invoicing by Sage were merely "incidental to Sage's agency requirements that it distribute *Continental's equipment* to various stations" and "under principles of agency law, Continental was a party to the initial purchase" by Sage from the Suppliers. Continental Response Memo, at 6.

Contrary to Continental's assertions, Sage did bear a significant risk of loss for the inventory. Sage did not hold bare legal "title;" it owned the Equipment in its warehouses and financed its purchase through a third-party lender. Under the express terms of the Contract, Sage bore the risk of loss for the Equipment until it was sold and delivered to Continental. Exh. 9, ¶ 14. The Contract also expressly refers to Sage as "owner" of the Equipment and refers to "purchase orders" and "future sales" of the Equipment to Continental. *See, e.g.*, Exh. 9, ¶'s 19A, 31B, and 34B. Continental itself refers in its briefs to its "purchases" of Equipment from Sage, *see, e.g.*, Continental Response Memo, at 6-7, and its own witnesses admit that Sage owned the Equipment and bore the risk of loss for same. For example, Manning testified that "[t]he contract that [Continental] entered into with Sage required them to own the inventory" and that Continental thereby avoided the "cost of money in the sense of having to buy the inventory." Transcript, at 175. And Greene confirmed that the notes he took on November 24, 2003, in which he wrote "Ownership – today Sage owns it all," referred to the fact that Sage owned all the Equipment in its warehouses. Transcript, at 347;

Exh. 68, at 3708. He further repeatedly referred to Continental as "purchasing" Equipment from Sage, and he testified that it was his understanding that Sage bore the risk of loss for the Equipment until it was delivered to Continental. *See, e.g.*, Transcript, at 326, 381, 385.[30]

As for the risk of getting "stuck with" the inventory, it is true that ¶'s 31B and 34 of the Contract, which set forth Continental's obligation to buy "Aged Stock" under certain circumstances and to purchase inventory (with certain exceptions) upon Contract termination, largely shielded Sage from this particular type of risk. Continental, however, provides no authority for its statement that Sage therefore "bore no risk commensurate with an independent distributor," thus "further demonstrat[ing] its position as an agent of Continental." Continental Trial Memo, at 20. There has been no showing that similar obligations are excluded from "independent distributorship" agreements, and the court will not assume that they are. *See, e.g., Sally Beauty Co.,* 801 F.2d at 1001 (involving distributorship agreement providing for manufacturer to buy back inventory upon termination). More importantly, however, the fact that the agreement between Continental and Sage is not (as discussed *supra,* n. 29) a traditional distributorship agreement has little bearing on whether Sage was Continental's agent. Again, Continental cites nothing in support of its contention that such status tends to support a finding of agency.

Finally, the court also notes that while Continental asserts it was directly liable, as principal, on Sage's purchases from the Suppliers, it also contends--both in its briefs and through the testimony of its witnesses--that its liability was only contingent. In its post-trial memorandum, Continental states the principle that "'[a]n agent acting within the scope of his apparent authority binds the

---

[30]    *See also* Exh. 33, at 3801 (Continental's typewritten note accompanying its January 14, 2004 check to Sage, referring to the cost of Equipment "sold" to Continental).

-35-

principal as though the principal itself had performed the action taken.'" Continental Trial Memo,

at 20 (quoting from *Grace Cmty. Church v. Gonzales*, 853 S.W.2d 678, 680 (Tex.App. 1993)).

Continental thus asserts that "under principles of agency law, Continental was a party to the initial

purchase" of Equipment by Sage from the Suppliers. Continental Response Memo, at 6. Elsewhere

in its briefs, however, Continental repeatedly urges that it was liable only if Sage failed to pay. *See*,

*e.g.*, Continental Trial Memo, at 17 ("Under black-letter agency law, as principal, Continental was

liable for all accounts payable to Continental's suppliers *that went unpaid by Sage*") (emphasis

added) and 20 ("Sage's Failure To Pay Suppliers Resulted In Continental's Direct Liability To The

Suppliers"). Manning also testified that throughout the period beginning in 1994 when Continental

first contracted with Sage, she believed Continental always had a direct liability to the Suppliers for

the purchases made by Sage and that the liability was contingent, i.e., only if Sage did not pay.

When asked how Continental accounted for that purported liability on its books, Manning stated that

as far as she was aware, Continental did not account for it. She also admitted that she was aware of

no writing that said that if Sage did not pay the Suppliers, Continental would. Indeed, despite

Continental's assertion that it was always liable to the Suppliers for the Equipment purchased by

Sage, Continental never accounted for any such liability (contingent or otherwise) on its books. Prior

to 1994, when Continental was itself purchasing the Equipment directly from the Suppliers,

Continental maintained accounts payable on its books for all such purchases. When Continental

contracted with Sage in 1994, Continental ceased maintaining such accounts payable on its books,

and no such payables were shown on its books at any time from 1994 through the end of 2003. It

was not until sometime after Sage's liquidation notice that Continental for the first time set up

accounts payable entries for the invoices issued by the Suppliers to Sage.

-36-

Manning acknowledged that throughout their relationship, even if Continental had wanted to put together an accounts payable listing, it could not have done so; Continental never received copies of the Suppliers' invoices to Sage. As Greene stated, "there would be no reason for [such] invoices to be provided to Continental." Transcript, at 325. That is because it was his understanding that there *were* no accounts payable owed by Continental to the Suppliers for the invoices issued to Sage. Transcript, at 408-409. Consistent with Greene's understanding, not a single Supplier contacted Continental after receiving Sage's liquidation notice to demand payment on the invoices for which Continental now claims it was liable. Indeed, during Greene's tenure as manager overseeing the Sage Equipment program, the Suppliers had never asked Continental to pay an invoice issued to Sage or looked to Continental to guarantee Sage's payments, and prior to the payments made in 2004 during the reconciliation process described above, Continental had never paid the Suppliers directly for invoices issued to Sage. Even after the events of September 11, 2001, when Sage had to freeze its accounts and stretch Supplier payables over a six- to eight-month period, none of the Suppliers contacted Continental seeking payment on the invoices issued to Sage, and Continental never told Sage that it had any liability for such invoices. To the contrary, Continental told Greenberg, Sage's principal, what Greenberg had expected, i.e., that it was Sage's responsibility to pay the Suppliers and that Sage needed to work it out with the Suppliers on its own.

In short, the evidence does not, as contended by Continental, "clearly show[]" that Sage was Continental's agent "in writing and in conduct," "[u]nder both the [Contract] and consistent with the parties' understandings." Continental Trial Memo, at 19. The evidence in the record proves otherwise. As Continental has failed to meet its burden of establishing an agency relationship, it cannot rely on that theory to offset the payments it made directly to the Suppliers against the amounts

-37-

it owes to Sage that are sought by the Trustee in this proceeding.

Continental next argues that it is entitled to a setoff regardless of whether Sage was its agent. In this section of its brief,[31] Continental first argues that Sage's breach was material and that Continental is therefore excused from further performance. The court notes that this contention is actually unrelated to the setoff issue; if Continental were truly excused, as it contends, from paying Sage for the Equipment at issue, there would be no need for a setoff, as Continental would not owe Sage the debt that the Trustee now seeks to collect. In any event, the court rejects Continental's contention that Sage's breach was material and that Continental was therefore excused from any further performance under the Contract

It is a "fundamental principle of contract law ... that when one party to a contract commits a material breach of that contract, the other party is discharged or excused" from further performance. *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994). In *Hernandez*, the plaintiffs' daughter was killed while riding as a passenger in an automobile negligently driven by a nineteen year old boy whose only asset was a $25,000 liability policy with State Farm Mutual Automobile Insurance Company. The daughter was covered under her parents' insurance policy with Gulf Group Lloyds, which included uninsured/underinsured motorist coverage of $100,000. Several weeks after the accident, the plaintiffs settled with the boy for the limits of his State Farm policy, without first obtaining Gulf Group's consent. They thereafter sought to recover from Gulf Group under the underinsured motorist coverage, and Gulf denied the claim based on their failure to obtain consent before settlement. *Id.*

---

[31]    Titled: "Irrespective Of The Agency Relationship, Sage's Breach Of The Agreement Supports a Complete Setoff Of The Amount Due To Suppliers."

The Texas Supreme Court ruled that the parents were entitled to judgment against Gulf

Group. Citing to the Restatement (Second) of Contracts § 241(a), the Court stated:

> In determining the materiality of a breach, courts will consider, among
> other things, the extent to which the nonbreaching party will be deprived of the
> benefit that it could have reasonably anticipated from full performance. ... The less
> the non-breaching party is deprived of the expected benefit, the less material the
> breach.

*Hernandez*, 875 S.W.2d at 693.[32] In upholding the trial court's judgment for the parents (which the

appellate court had reversed), the Court found that because Gulf Group had not been prejudiced by

the breach, the breach was not material. The Court explained that there might be situations where

an insured's settlement without consent "prevents the insurer from receiving the anticipated benefit

from the insurance contract; specifically, the settlement may extinguish a valuable subrogation

right." *Id.* Where, however, the extinguished subrogation right has no value, the insurer may not

be deprived of the expected benefit. "In the latter situation-where the insurer is not prejudiced by

the settlement-the insured's breach is not material." *Id. See also Hanson Production Co. v.*

*Americas Ins. Co.*, 108 F.3d 627, 630-31 (5th Cir. 1997).

The *Hernandez* court relied primarily on the first Restatement factor in determining

materiality, i.e., the extent to which the nonbreaching party will be deprived of the benefit he could

have reasonably anticipated from full performance. *Hernandez*, 875 S.W.2d at 693. The complete

list is contained in § 241 of the Restatement (Second) of Contracts, as follows:

> In determining whether a failure to render or to offer performance is material,
> the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the

---

[32]      The Court listed in a footnote the other four Restatement factors (discussed *infra*) for determining
the materiality of a breach.

> benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compen-
> sated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to
> perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to
> perform will cure his failure, taking account of all the circumstances
> including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or
> to offer to perform comports with standards of good faith and fair
> dealing.

Restatement (2d) of Contracts § 241 (1981). The comments to § 241 characterize the first factor--the

factor that was the Court's primary focus in *Hernandez*--as "an important circumstance" in

determining the materiality of a breach. *Id.* (Comment b); *see also Fedgess Shopping Centers, Ltd.*

*v. MNC SSP, Inc.*, 2007 WL 4387337 at *3 (Tex.App. Dec. 18, 2007) (first factor is "court's

primar[]y consideration in determining the materiality of a breach"). The comments describe the

second factor, i.e., the extent to which the nonbreaching party can be adequately compensated for

the lost benefit, as a "corollary of the first." Restatement (2d) of Contracts § 241, Comment c. Here,

Continental contends that Sage breached ¶ 19A of the Contract, in which "Sage warranted and

represented to Continental that it would 'pay all suppliers on or before the date that such payment

is due.'" Continental Trial Memo, at 22 (quoting from Exh. 9). According to Continental, that

breach was material, and it excused any further performance. Continental recognizes that Texas

courts apply the five Restatement factors discussed above, and Continental presents its materiality

argument within that analytical framework.

Again, the first factor is the extent to which the injured party will be deprived of the benefit

he reasonably expected. As indicated above, Continental asserts that its "key benefit under the

Contract" was "the efficient and consistent delivery of goods from its suppliers to its stations."

-40-

Continental Trial Memo, at 24.  Continental urges that it was deprived of this key benefit because

Sage's failure to pay Suppliers on a timely basis placed the supply chain in jeopardy.  Continental

made a similar argument at the summary judgment stage.  However, in its summary judgment papers,

Continental urged that Suppliers were turning to Continental for payment and that unless Continental

paid them, it would face a break in supply.  Continental no longer advances the contention that

Suppliers were demanding payment from Continental, no doubt because of the ample evidence in

the record that they were not making such demands and the further evidence that they were not

threatening to refuse to ship to Continental unless Continental paid the invoices issued to Sage.  As

a result, all that Continental now offers in support of its break-in-supply contention is that Sage's

failure to timely pay Suppliers "endangered at least some suppliers' continued viability" and "overall

threatened a gap in supply."  Continental Trial Memo, at 24.

        In support of its contention that Sage's failure to timely pay jeopardized the "viability" of

some Suppliers, Continental cites to emails that it received from two of the Suppliers.  One email

is from East-West Corporation, and Continental quotes the portion that states:  "A hit like this puts

us in a very difficult situation."  Continental Trial Memo, at 24 (quoting from Exh. 20).  Two emails

are from another Supplier, Global Inflight Products ("GIP"), which Continental quotes as stating that

"GIP is rapidly heading for a cash-flow problem" and that "hanging in there becomes more and more

difficult as the cash flow crunch becomes more and more critical with each passing day."  *Id.*

(quoting from Exhibits 26 and 31).  Continental also cites to Rob Greene's testimony that such

statements were consistent with his understanding of what some of the Suppliers were facing.

        The emails from these Suppliers and Greene's testimony regarding same are hardly a basis

for assuming that the Suppliers might have to go out of business or cease production of the

Equipment unless paid by Continental for the invoices issued to Sage. Indeed, if Continental were so concerned about the Suppliers' cash crunch and potential insolvency, it presumably would not have waited months before beginning to make the payments purportedly necessary to ward off any such insolvency and consequent supply disruptions.

As for the second Restatement factor, corollary to the first, Continental contends that it could not have been adequately compensated if Sage's nonpayment resulted in a break in supply. Continental first posits the potential insolvency of the Suppliers, quoting Greene's testimony that "by not allowing the suppliers to stay solvent with regard to cash flow, it does, in fact, cripple the whole pipeline all the way back to Continental Airlines with regard to operational performance." Continental Trial Memo, at 24-25 (quoting Transcript, at 452). Again, however, the meager evidence of such potential insolvency is insufficient to show a threat to Continental's supply pipeline.

Continental also relies on the fact that most of the Equipment was custom made, stating: "Therefore, once Sage announced that it was freezing payments and, in turn, suppliers refused to continue shipping through Sage, Continental had no choice but to commit to paying the suppliers in order to avoid a break in supply." _Id._ at 25.[33] According to Continental, money damages would be inadequate, as the costs associated with a business disruption involving such custom made goods would "go beyond quantifiable amounts reflecting the cost, for example, of securing substitute equipment." _Id._

Continental is careful to premise this potential "business disruption" on the fact that the

---

[33]     The court notes that there is no evidence in the record that Continental made any such commitment.

Suppliers would "refuse[] to continue shipping *through Sage*" (emphasis added), because Continental is well aware that even if the Suppliers were to refuse shipment to Sage, there is ample evidence in the record that they would not refuse to ship to Continental and that they would not condition any such shipments on prior payment by Continental of the outstanding invoices issued to Sage. Indeed, the "work-arounds" that Continental established included direct shipments from the Suppliers. Moreover, Manning testified that to the extent there were any shortages of Equipment for Continental flights, Continental "mitigated any shortages with substitutions." Transcript, at 267. Continental simply has not demonstrated the inadequacy of money damages to compensate for any lost part of its key benefit, i.e., the efficient delivery of goods to its stations, and Continental's suggestion that such damages would "go beyond quantifiable amounts" is wholly unsupported by the record.[34]

---

[34]    While Continental, in its post-trial memorandum, premises its argument regarding excuse of performance on the breach of ¶ 19A of the Contract, i.e., Sage's failure to pay Suppliers, the court notes that even if Continental were to base its contention on a different breach--the failure to deliver Equipment as necessary for Continental's flights--Continental has failed to establish the extent to which any such breach deprived it of its key benefit or the adequacy of money damages to compensate therefor. Again, the evidence shows that Continental continued to purchase and receive delivery of Equipment from Sage for an extended period, at least through the end of December, and that Continental in fact continued to "liv[e] off the fat" of Sage deliveries well into late January or February of 2004. Transcript, at 410-411. Greene testified that Sage was doing everything to maintain "business as usual," which "[f]rom [his] perspective" meant the "efficient delivery of equipment to Continental" in order to avoid any break in the supply chain. Transcript, at 365. And Manning's December 8, 2003 email to her supervisor reported that Continental "ha[d] not experienced shortages of food or equipment on Continental flights" as a result of the situation created by Sage's orderly wind down. Exh. 25. While Manning further reported in that email that Continental had "workarounds" established, both through direct shipment from Suppliers and through the Michael Lewis Company, Continental never established the extent to which any such workarounds were necessary. Continental acknowledges the "lack of shortages" in the first two weeks after Sage's liquidation announcement, consistent with Manning's testimony that if there had been shortages in that period, "then none of us would have been doing a very good job ..." Transcript, at 207. As for shortages beyond that period, there is Greene's indeterminate testimony that there was no stoppage of Continental's operations, as they continued with "many" work-arounds. Transcript, at 452. And while Manning testified that the situation was "extremely time-consuming" for Greene and his team, she was referring not only to time spent to insure against potential shortages of Equipment, but also to time spent in connection with the reconciliation of Supplier payables, a matter unrelated to the extent of shortages. As indicated above, Manning further testified that to the extent there were any shortages, Continental "mitigated" them with substitutions. In sum, even if Continental had argued--as the breach excusing its performance --the failure to deliver Equipment as necessary for Continental's flights, Continental has failed to quantify in any way the extent or proportion of any such shortages or the inadequacy of money damages to compensate therefor.

With respect to the third materiality factor, i.e., the extent to which the breaching party will suffer forfeiture, Continental argues that because Sage was its agent and Continental was "ultimately liable for payment to the suppliers to the extent Sage refused," Continental Trial Memo, at 26, Continental's direct payments to the Suppliers "could not" have caused Sage any forfeiture. *Id.* As indicated above, however, Continental has failed to establish any such agency relationship with Sage.

Continental further notes that in a Restatement comment concerning forfeiture, it is explained that "'a failure [to perform] is less likely to be regarded as material if it occurs late ... and more likely to be regarded as material if it occurs early.'" *Id.* at 25 (quoting from Restatement (Second) of Contracts § 241 (1981), cmt. d). According to Continental, "Sage's breach occurred early--before it performed its obligations to Continental... ." *Id.* at 26. However, while Sage had not yet performed its obligation under ¶ 19A of the Contract to timely pay the Suppliers, it had in fact performed the substantial obligation of selling and delivering Equipment to Continental and was awaiting payment of the purchase price therefor.

Continental attempts to finesse this problem by characterizing that performance as a mere "paper accounting entry" on Sage's books, explaining that because Sage had not paid for the Equipment, it had nothing to forfeit once Continental paid the Suppliers. This characterization, however, overlooks the fact that Sage owned the Equipment that was sold and delivered to Continental and financed its purchase through a third-party lender. This was precisely the arrangement that Continental itself had required Sage to put in place at the inception of their relationship. As a result, Sage's lender had a lien on the Equipment and other inventory held by Sage, and Sage owed its lender substantial sums on the line of credit that was secured by that inventory. Indeed, Sage may even have obtained advances based on the very Equipment for which

the Trustee now seeks payment from Continental, inasmuch as unpaid goods were included in the

borrowing base formula on Sage's line of credit. Under the circumstances, Continental's

characterization of Sage's performance as a mere "paper accounting entry" is self-serving and

disingenuous.

With respect to the fourth factor, i.e., the likelihood that the breaching party will cure his

default, Continental notes that Sage "unequivocally declared" in its liquidation notice that it had

frozen all supplier accounts payable then due and that Sage's conduct subsequent thereto "confirmed

that it never planned on curing its breach." Continental Trial Memo, at 27. Continental further cites

to the Trustee's testimony that the Sage estate is probably administratively insolvent, i.e., that there

will likely be insufficient funds to pay in full even the administrative priority claims, with nothing

left over for general unsecured creditors.

It is worth noting that Continental's refusal to pay the sum of $2,288,678.31 to Sage at a

critical point in Sage's wind down operation could have contributed to some extent to Sage's current

inability to pay anything at all to its unsecured creditors. Nonetheless, while it is clear from the

record that Sage originally intended to pay some percentage of the Suppliers's claims, Continental

is correct that Sage never expected to "cure" the breach of its obligation under ¶ 19A to pay them

in full, and there is and was virtually no likelihood that it could do so.

The fifth and final factor is the extent to which the breaching party's behavior comports with

standards of good faith and fair dealing. In this regard, Continental first asserts that Sage's failure

to pay Suppliers "placed Continental in a potentially devastating bind where suppliers could have

cut off supply." Continental Trial Memo, at 27-28. According to Continental, Sage failed to inform

Continental of its decision before the supply pipeline was threatened and Continental "only

discovered Sage's decision when it was informed by a supplier." *Id.* The record reflects, however, that while Rob Greene and others in his department may have first heard of Sage's liquidation decision when they received, on Monday, November 24, 2003, a copy of the liquidation notice that Sage had sent to the Suppliers (Exhibit 14), they also received on the same day a copy of the liquidation notice that Sage had sent directly to Continental (Exhibit 15). More importantly, the fact that Sage waited until its decision was finalized to inform Continental of the liquidation is not evidence of a lack of good faith, particularly where, as here, Sage made it clear in its notice and in discussions with Continental immediately following its transmission that Sage planned to do everything it could to "ensure a smooth/seamless transition," "to minimize any disruption in [Continental's] service," and "to make these last few months of our partnership a success." Exh. 15. Moreover, as discussed above, Sage's failure to pay Suppliers did not place Continental in a "devastating bind," threatening Continental's supply line. Again, Sage continued to sell and deliver Equipment to Continental for an extended period after the liquidation notice. To the extent there were any shortages of Equipment, there is ample evidence in the record that if Suppliers were to refuse shipment to Sage, they would nonetheless ship directly to Continental and would not condition any such shipments on prior payment by Continental of the outstanding invoices issued to Sage.

Continental further contends that Sage's actions lacked good faith because its intent in seeking to collect from Continental was "to reduce its own, independent debt to its lender" and to protect the interests of its principals, who had guaranteed that debt. Continental Trial Memo, at 28. However, there is nothing evincing bad faith in a debtor's attempt to collect receivables and pay the proceeds to creditors in the order of their priorities. Again, Sage was required to own the Equipment

-46-

and had to finance its purchase through a third-party lender, resulting in a lien on the inventory. This

was precisely the arrangement that Continental itself had required of Sage, and it is disingenuous for

Continental to now suggest that Sage's effort to liquidate receivables for payment first to its secured

lender somehow shows bad faith.[35]

Upon consideration of all the circumstances and guided by the materiality factors discussed

above, the court finds that Sage's breach in failing to pay the Suppliers as required by ¶ 19A of the

Contract was not a material breach that excused Continental's further performance.[36]

---

[35]     Though not formally argued in the good faith section of its brief, Continental elsewhere urges that Sage timed the November 21st liquidation announcement so that it would have the most impact. Continental suggests that it was sent out on the Friday before Thanksgiving in part because the Suppliers' account managers "were not likely" to be in their offices during the Thanksgiving vacation week and were therefore "less likely" to stop shipments. Continental Proposed Findings, at 8. Continental further contends that Sage had been stockpiling inventory prior to the announcement as a way of increasing the funds that a liquidation would bring to the secured lender, thereby reducing the liability of Sage's principals on their guarantees. *Id.*

        The evidence in the record supporting these contentions is insubstantial. When asked whether the inventory that Sage had on hand as of November 21, 2003 was comparable to what was typically on hand at that busy time of year, Greene characterized it as "a bit more." Transcript, at 451. The court declines to find a lack of good faith based on such testimony and on speculation that the Suppliers would have insufficient staff available to stop shipments. Indeed, as indicated above, the Suppliers apparently had sufficient personnel on hand that Continental's phone was "ringing off the hook" with inquiries. And Sage did in fact receive numerous reclamation demands. *See* Exh. 29.

[36]     The court further notes that even if the breach of ¶ 19A were material, Continental's performance would not be excused. "Where one party materially breaches a contract, the non-breaching party is forced to elect between two courses of action--continuing performance or ceasing performance." *Chilton Insurance Co. v. Pate & Pate Enterprises, Inc.*, 930 S.W.2d 877, 887-88 (Tex.App. 1996) (citation omitted). "A party who elects to treat a contract as continuing deprives himself of any excuse for ceasing performance on his own part." *Hanks v. GAB Business Services, Inc.*, 644 S.W.2d 707, 708 (Tex. 1982). In *Chilton*, the court explained that the two courses of action from which the non-breaching party had to choose were mutually exclusive; i.e., the party either had to "discontinue its own performance, rescind the contract, and sue for material breach, or continue its performance and lose the other party's material breach as an excuse for its own non-performance." *Chilton*, 930 S.W.2d at 888. In that case, the non-breaching party "[b]y its actions, ... chose the latter." *Id.*

        Here, Continental continued to order Equipment from Sage after the November 21, 2003 liquidation notice, and it accepted such Equipment and used it in its operations. Manning specifically testified that even though Continental knew, from the time of its receipt of that notice on November 24, 2003, that Sage had frozen payments to the Suppliers, it nonetheless made a decision to continue to purchase from Sage. Continental did this for an extended period, well after transmission of its termination notice on December 15, 2003. Sage continued to invoice Continental at the Contract price, and it is Continental's position that, after setting aside sufficient funds to use as an offset against its alleged damages, Continental continued to pay Sage on normal terms, including both the Equipment cost and the Service Fee as specified in the Contract. Indeed, according to Manning's testimony, Continental's performance during this period at the close of the parties' relationship included the purchase of Aged Stock under the provisions of ¶ 31B of the Contract.

While Sage's breach was not material, Continental would nonetheless have a claim for any damages that might have flowed therefrom. And Continental correctly contends in the next section of its brief that it is entitled to assert such a damage claim "[i]rrespective of whether th[e] Court finds ... the breach ... material." Continental Trial Memo, at 28. Continental, however, has failed to establish its damages.

Continental asserts that under Texas contract law, it is "entitled to recover damages that are the 'natural probable and foreseeable consequence of the defendant's conduct.'" *Id.* (citing *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981)). Continental notes that according to the Restatement, when a breach results in claims by third parties, the breaching party "'is liable for the amount of any judgment against the injured party together with his reasonable expenditures in the litigation, if the party in breach had reason to foresee such expenditures as a probable result of his breach at the time he made the contract.'" *Id.* at 28-29 (quoting from Restatement (Second) of Contracts § 351 (1981), cmt. c.). The breaching party's mere knowledge of the existence of agreements between the non-breaching party and such third parties may, if he causes the incurrence of liability to the third parties, give rise to his own liability for damages to the non-breaching party. *Id.* at 29 (citing Restatement (Second) of Contracts § 351, illus. 8.).

Continental states that here, it is "obvious" that the natural and foreseeable result of Sage's breach "would be that Continental would pay the suppliers directly." *Id.* Continental relies on two points. First and "[f]oremost," it relies on Sage's purported "admi[ssion]" that failure to pay Suppliers would result in supply disruptions. Continental cites to Greenberg's testimony that failure

---

However, while treating a contract as continuing divests a party of its excuse for nonperformance, it does not deprive that party of its cause of action for any damages resulting from the breach. *See, e.g., Board of Regents of Univ. of Texas v. S & G Construction Co.*, 529 S.W.2d 90, 97 (Tex.App. 1975), *overruled on other grounds, Fed. Sign v. Texas Southern Univ.*, 951 S.W.2d 401 (Tex. 1997).

-48-

by Sage to pay the Suppliers would result in the Suppliers refusing shipment to Sage. Continental

urges that it was therefore foreseeable that absent payment by Sage, Continental would have to pay

the past due invoices issued to Sage in order to avoid supply disruptions. Again, however,

Greenberg was referring to the Suppliers' potential refusal to ship to Sage, not to Continental. And

there is ample evidence in the record that they would not refuse to ship to Continental because of the

unpaid Sage invoices and that they would not condition any such shipments on prior payment by

Continental of the Sage liabilities. Indeed, the "work-arounds" that Continental established included

direct shipments from the Suppliers. Again, Sage had made it clear in its liquidation notice that it

planned to do everything it could to ensure a smooth transition and to avoid shortages in supply, and

Sage in fact continued to sell Equipment to Continental for an extended period while Continental

arranged for a replacement distributor. Manning testified that to the extent there were any shortages

in this period, Continental "mitigated [them] with substitutions." Transcript, at 267. Under the

circumstances, Continental's reliance on Sage's purported "admission" of the foreseeability of

supply disruptions is unfounded.

Continental also relies on the fact that Sage knew Continental had contracted directly with

Suppliers even though it may not have known the exact contents of those agreements. Continental

states that Sage therefore could have foreseen that failing to pay Suppliers would trigger "some

obligation" on Continental's part under its own agreements with the Suppliers, citing the

Restatement illustration mentioned above. Putting aside the vagaries of Continental's assertion that

the triggering of "some obligation" was foreseeable, the Restatement comment and illustration cited

by Continental refer to breaches that result in claims by third persons against the non-breaching

party. The record here does not establish that claims were made against Continental by the

Suppliers. And while Continental states that mere knowledge of the existence of agreements with third parties may result in liability "where the breaching party causes the non-breaching party to incur liability to the third-party," Continental Trial Memo, at 29, there is no evidence that Continental "incurred" any liability to the Suppliers--much less that Sage "caused" it. The third-party contracts in evidence do not provide for such liability, and Continental has failed to adduce other evidence that would establish it.

Based on the record presented, the damages alleged by Continental, i.e., the payments made by it to the Suppliers on account of invoices issued to Sage, were not the "natural, probable, and foreseeable consequence" of Sage's breach of its obligation under ¶ 19A of the Contract. The court notes that Continental presented no argument in its post-trial memorandum concerning other damages that might have resulted from the breach of ¶ 19A or from any other breach of the Contract. To the extent that there might have been such other damages, however, Continental has failed to establish them.[37] As Continental has failed to establish its damages, the court need not reach any of the other issues that might affect the propriety of the purported setoff, e.g., mutuality of debt and other prerequisites under either Texas or bankruptcy law.

As an additional affirmative defense to the Trustee's complaint, Continental claims that Sage and the Trustee are estopped from denying that the payments made by Continental to Sage during

---

[37]      As discussed *supra*, n. 34, even if Continental were to premise its recovery on a different breach--e.g., the failure to deliver Equipment as necessary for Continental's flights--Continental has failed to establish the extent of any damages flowing therefrom. Again, the evidence shows that Continental continued to purchase Equipment from Sage for an extended period and continued to "liv[e] off the fat" of Sage deliveries well into late January or February of 2004. Transcript, at 410-411. Manning's December 8, 2003 email to her supervisor reported that Continental "ha[d] not experienced shortages of food or equipment on Continental flights" as a result of the situation created by Sage's orderly wind down. Exh. 25. While she further reported that Continental had established "workarounds" to avoid any shortages, Continental never established the extent to which any such workarounds were necessary, either before the December 8 email or thereafter. And again, Manning testified that to the extent there were any shortages, Continental mitigated them with substitutions.

-50-